Argued October 31; affirmed December 13, 1938; rehearing denied
January 17, 1939

# DE TWEEDE NORTHWESTERN & PACIFIC HYPOTHEEKBANK *v.* W. M. BARNETT ESTATE ET AL.

(85 P. (2d) 361)

*C. B. McConnell,* of Burns, for appellant.
*Frank G. Dick,* of The Dalles, for respondents.

RAND, J. This is a suit for the reformation and foreclosure of a chattel mortgage on one-third of the crop grown on certain described lands in Sherman county, Oregon, during the year 1934. The mortgage was given to the plaintiff on May 1, 1934, by the defendants, Independent Warehouse and Milling Company and The W. M. Barnett Estate.

It is alleged in the complaint that, because of a mutual mistake, the description contained in the chattel mortgage of the lands upon which the mortgaged crop was to be grown failed to include the NE¼ of section 25, T. 2 N., R. 16 E., W. M., and the prayer of the complaint is that the mortgage be rectified so as to include said quarter section of land and one-third of the crop grown thereon during said year.

It appears from the evidence that the lands included in said mortgage and the quarter section not included are all a part of what is referred to in the evidence as the Thornberry ranch and that the same is a wheat ranch consisting of about 1600 acres of land; that, during the year 1919, Thornberry and wife, who were then the owners of the land, mortgaged the same to the plaintiff, a banking corporation doing business in Spokane, Washington, for the sum of $65,000 and that, at the time of the transactions complained of here, said mortgage had not been foreclosed and continued to be a first lien upon said lands; that, after the giving of said mortgage, Thornberry and wife became indebted in a large

sum of money to the two defendants above named, or to their predecessors in interest, and that, to secure said indebtedness, they executed and delivered a second mortgage upon said lands and that said second mortgage has been foreclosed and the lands sold subject to the lien of the first mortgage and that said two defendants above named became the purchasers thereof and were the owners of all said lands at the time the chattel mortgage above referred to was given.

It also appears from the evidence that during the year 1934, all said lands were leased by the two defendants above named to one W. H. Burres, who, under the terms of the lease, was to receive two-thirds of the crop and the said owners the remaining one-third thereof; that Burres was having difficulty in financing his operations on said lands and applied to the Regional Agriculture Credit Corporation for a loan and that he also applied for a wheat allotment contract pursuant to the provisions of the Agricultural Adjustment Act of May 12, 1933; that he made said applications through one H. M. Stephens, who at the time was the deputy superintendent of banks in charge of the liquidation of the Bank of Commerce in Wasco, which was in close proximity to the lands above referred to and that at said time Burres owed the bank a considerable sum of money; that, in order to obtain the loan, it was necessary to obtain from the plaintiff an assurance that its mortgage upon the lands would not be foreclosed until after the crop grown upon the lands during that year could be grown and harvested; that Stephens submitted the matter for Burres to the plaintiff and that the plaintiff thereupon prepared the crop mortgage above referred to and forwarded the same to Stephens with directions for him to secure the execution thereof by the two defendants above named and that, when the

same was submitted to the said defendants, they immediately called Stephens' attention to the fact that the 160 acres of land above referred to had been omitted from said mortgage and, before signing the same, were assured by Stephens that the instrument as drawn was what the plaintiff wanted, and thereupon, before executing the same, one of the two defendants, through its secretary, caused the following notation to be inserted in the mortgage, to wit: ''Said mortgage (referring to the mortgage that plaintiff held upon the entire tract) was given by H. B. Thornberry & wife and the present mortgagors of the crops do not commit themselves as to the accuracy of the description of the real property mortgage (referring to the recital in the crop mortgage of the lands upon which the mortgaged crop was to be raised during that year).''

It was not alleged in the complaint, nor was it even pretended upon the trial, that, prior to the time when defendants signed the mortgage sought to be reformed herein, there was any understanding, contract or agreement, verbal or otherwise, between the bank and the defendants in respect to the giving of this or any mortgage upon any crop or crops whatsoever. All that plaintiff's testimony tends to show was that the bank, in drawing this mortgage upon one of its own forms, because of a clerical error committed by one of its own agents, for which the defendants were in no way responsible, omitted from the crop mortgage 160 acres of land which it intended should be included therein and that, without discovering the error, the bank forwarded the mortgage to Stephens to have it signed by the defendants and, as the evidence shows, they signed it with knowledge of the error.

■ In this connection, it must be borne in mind that the mortgage given to plaintiff by Thornberry and his

wife was a first lien upon the lands; that it had been long past due and that the defendants' ownership of the lands was subject to the lien of said mortgage; that plaintiff was in a position to foreclose its mortgage at any time and thereby divest the defendants of their interest in the lands. It was, therefore, to defendants' interest to postpone, if possible, a foreclosure of said mortgage and obviously, because of that fact, they signed the crop mortgage in the hope that, with good crops and good prices, the lien of that mortgage might be satisfied and discharged. Hence, while not personally liable thereon, they were willing to forego their interest in the crops for that year and, to that end, they signed the crop mortgage when it was presented by Stephens although they had not previously agreed to do so. Hence, it is clear from the evidence that the mistake was unilateral and not mutual and that, since there had been no previous agreement between the parties, there can be no standard to which the written mortgage may be made to conform and, hence, there can be no rectification of it without making an entirely new contract between the parties and one containing terms to which the defendants have never assented.

Moreover, when Stephens, at the request of the bank, presented the chattel mortgage to the defendants for execution by them, it constituted, in the absence of any previous understanding or agreement between them, a valid offer upon the part of the bank to enter into a contract with the defendants in accordance with the terms therein stated, which the defendants were entitled to accept at its face value, and, they having accepted and signed the writing, it constituted a valid contract binding upon both parties and the only contract in existence between them. Under such circumstances, there can be

no rectification of the mortgage without the making of a new contract to which none of the parties have ever assented.

 While there is much confusion upon the law of mistake, we think it is well settled that, where there is clear proof of a previous oral contract to which the written contract can be made to conform and a mistake has been made in reducing the oral contract previously made to writing, the party prejudiced by the mistake in the writing is entitled to equitable relief. The party so prejudiced by the mistake may proceed in a court of equity in advance of performance for a decree of reformation or he may apply for an injunction restraining the other party from proceeding under or using the contract until the mistake has been corrected, but, in such case, it is necessary to require competent proof of the previous oral agreement; otherwise, there is no standard by which the rectification can be made to conform. For, as said in 3 Williston on Contracts, section 1548, that, although there need not be a binding agreement prior to the writing of which reformation is sought but:

"Equity does insist that the parties shall have come to a complete mutual understanding of all the essential terms of their bargain, for, otherwise, there would be no standard by which the writing could be reformed."

As said in an article by Roland K. Foulke, published in the Columbia Law Review, vol. 11, at page 301:

"In the case, therefore, of an alleged mistake in reducing the contract to writing when the parties disagree as to what the contract really was and there is no other evidence, the court cannot decree a reformation because there is no clear proof of a contract to which the written agreement can be made to conform."

Again, on the following page, the writer says:

"No mistake of one party in reducing the contract to writing can deprive the other of his rights under the contract already formed and, on the other hand, the circumstance of the party making the mistake in reducing the contract to writing cannot deprive him of the right to have the mistake corrected. It is not necessary, therefore, although there are some expressions in the books to that effect, for the mistake to be mutual."

This rule, of course, applies only to a case where a previous contract had been formed and a mistake was made in reducing the contract to writing. In the instant case, however, there was no previous oral contract. The whole evidence shows there had been no dealings of any kind, either verbal or otherwise, between the plaintiff and the defendants in respect to this writing or as to what should be included in it. The plaintiff was not induced to make the mistake in the writing by anything said or done by the defendants and, since there was no previous oral contract or understanding between the parties as to what the writing should include, it cannot be made to conform to a previous contract since none existed. Hence, the rule above stated, that the mistake need not be mutual in a case where a previous oral contract had been formed and the mistake had been made in reducing it to writing, has no application here, for, in the instant case, the giving of the mortgage constituted the making of a valid contract complete in itself and without reference to any previous contract orally formed and consisted of an offer made by the plaintiff and accepted by the defendants. In such case, before the plaintiff can be entitled to a reformation, the mistake must be mutual and not unilateral as was the one in question here.

Again, in Kerr on Fraud and Mistake, 6 ed., edited by S. E. Williams, p. 612, the author says:

"There can be no rectification if the mistake be not mutual or common to all parties to the instrument, or if one of the parties knew of the mistake at the time he executed the deed. Where one party only has been under a mistake, while the other, without fraud, knew what the character of the deed was, and intended that it should be, the Court cannot interfere, for otherwise it would be forcing on the latter a contract he never entered into, or depriving him of a benefit he had bona fide acquired by an executed deed. Rectification can only be had where both parties have executed an instrument under a common mistake, and have done what neither of them intended. There must be evidence to satisfy the requisites for rectification on the ground of common mistake pointed out in Fowler v. Fowler by Lord Chelmsford. (Vaudeville Electric Cinema v. Muriset, 1923, 2 Ch. 74; 92 L. J. Ch. 558.) A mistake on one side may be a ground for rescinding, but not for correcting or rectifying an instrument.

"There can be no rectification where there is not a prior actual contract by which to rectify the written instrument."

The reference to what Lord Chelmsford said is as follows:

"The power which the Court possesses of reforming written agreements where there has been an omission or insertion of stipulations contrary to the intention of the parties and under a mutual mistake, is one which has been frequently and most usefully exercised. But it is also one which should be used with extreme care and caution. To substitute a new agreement for one which the parties have deliberately subscribed ought only to be permitted upon evidence of a different intention of the clearest and most satisfactory description."

Then quoting from Lord Thurlow, he continued:

"* * * It is clear that a person who seeks to rectify a deed upon the ground of mistake must be re-

quired to establish, in the clearest and most satisfactory manner, that the alleged intention to which he desires it to be made conformable continued concurrently in the minds of all parties down to the time of its execution, and also must be able to show exactly and precisely the form to which the deed ought to be brought. For there is a material difference between setting aside an instrument and rectifying it on the ground of mistake. In the latter case you can only act upon the mutual and concurrent intention of all parties for whom the Court is virtually making a new written agreement.''

Pomeroy states the rule upon this question as follows:

''* * * Reformation is appropriate, when an agreement has been made, or a transaction has been entered into or determined upon, as intended by all the parties interested, but in reducing such agreement or transaction to writing, either through the mistake common to both parties, or through the mistake of the plaintiff accompanied by the fraudulent knowledge and procurement of the defendant, the written instrument fails to express the real agreement or transaction. In such a case the instrument may be corrected so that it shall truly represent the agreement or transaction actually made or determined upon according to the real purpose and intention of the parties.''

2 Pom. Eq. Jur., 3 ed., section 870.

Pomeroy defines the cases where reformation may be had of a contract, deed, settlement or other instrument in these words:

''* * * Equity has jurisdiction to reform written instruments in but two well-defined cases: 1. Where there is a mutual mistake,—that is, where there has been a meeting of minds,—an agreement actually entered into, but the contract, deed, settlement, or other instrument, in its written form, does not express what was really intended by the parties thereto; and 2. Where there has been a mistake of one party accompanied by

fraud or other inequitable conduct of the remaining parties. In such cases the instrument may be made to conform to the agreement or transaction entered into according to the intention of the parties.''

Id., section 1376.

Again, Pomeroy says a mistake, where reformation is sought:

''must be material, and must have determined the action of the party in entering into the contract or transaction. It may be common to both parties; it may be induced or procured by the conduct of the plaintiff; or it may be an error of the defendant alone, wholly due to himself. In either case it will be a defense.''

Id., section 868.

Referring now to our own decisions, it was held in *Evarts v. Steger*, 5 Or. 147, that the law presumes that an agreement, when reduced to writing, has all its terms embraced in the writing, and that, to entitle a party to relief in a court of equity upon the ground of mistake, it must appear that the mistake was mutual.

In *Lewis v. Lewis*, 5 Or. 169, which was a suit to correct an alleged mistake in a deed and to enjoin an action at law for the recovery of possession of a portion of the land described in the deed, it was held:

''that in cases of this kind the complaint should distinctly show what was the original agreement and understanding of the parties, and should point out with clearness and precision wherein there was a mistake, and should show that it did not arise from gross negligence of the plaintiff.''

It was held in *Epstein v. The State Ins. Co.*, 21 Or. 179 (27 P. 1045), approved in *Brown v. Briggs*, 134 Or. 184 (292 P. 1034), that, in order to reform a written contract on the ground of accident or mistake, the evidence must be clear and satisfactory; otherwise, the relief will

not be granted; that, in addition to the ordinary burden of proof which rests upon every litigant who holds the affirmative of an issue, there is in this class of cases the additional burden of overcoming the strong presumption created by the contract itself, which the proceeding seeks to reform.

Again, in *Meier v. Kelly*, 20 Or. 86 (25 P. 73), it was held that in a suit to reform a deed or mortgage on the ground of mistake, the complaint must allege distinctly what the original agreement was and point out with clearness wherein there was a mistake and that it did not arise from the gross negligence of the plaintiff and the mistake must appear to have been mutual.

In *Massachusetts Protective Ass'n v. Palmer*, 141 Or. 688 (18 P. (2d) 585), the court said:

"* * * It is a rule of general application that the contract as written by the parties shall be held to embody all prior and contemporaneous agreements and, therefore, that evidence of matters outside the instrument cannot be admitted to control its legal effect. If the rule were otherwise, there would be no security in written contracts. But a court of equity has power to reform an instrument so that it will express the actual agreement of the parties, where there has been a mutual mistake or a mistake upon the part of one and fraud or inequitable conduct on the part of the other: Columbian Nat. L. Ins. Co. v. Black, 35 Fed. (2d) 571, 71 A. L. R. 128, and cases cited. But in a suit in equity brought to reform a contract upon the ground of fraud or mistake, parol evidence is admissible to establish that the contract was entered into by mutual mistake, or mistake on the part of one and fraud on the part of the other."

In *Doerfler v. Richman et al.*, 151 Or. 398 (49 P. (2d) 988), it was held that:

"* * * 'where a person obtains a contract or other advantage by mistake or misstatements innocently made, he can not retain the advantages he has gained

when he discovers his mistake. If he does so his innocent misstatement becomes from that moment a deliberate misrepresentation, or in other words fraud.' Redgrave v. Hurd, C. D. 1, 12, 51 L. J. Ch. 113; Scott v. Coulson, 1903, 2 Ch. 249, 72 L. J. Ch. 600; Kerr on Fraud and Mistake, 5th ed., p. 519.''

It is clear from the facts stated that, in the giving of this mortgage, the defendants were dealing with the plaintiff at arm's length and that there was no relationship of trust and confidence existing between them at the time the mortgage was given. They were dealing with their own property and were under no legal obligation to mortgage it or to include within the terms of the mortgage the omitted quarter section of land. The mistake was that of the plaintiff alone and was not induced by fraud or inequitable conduct upon the part of the defendants. Under those circumstances, it was not the duty of the defendants to make any disclosure to the plaintiff of the error contained in the chattel mortgage and, since the mistake was not mutual or induced by fraud or inequitable conduct upon the part of the defendants, there are no grounds upon which a suit for reformation can be maintained.

For these reasons, the decree of the lower court must be affirmed, and it is so ordered.

Rossman and Kelly, JJ., not sitting.