Argued December 17, 1958, on rehearing May 20, former opinion
withdrawn, reversed and remanded with directions
June 17, petition for rehearing denied July 16,
1959

## SCOVILLE ET UX v. HAMPTON ET AL
## SCOVILLE ET UX v. HAMPTON ET AL, d/b/a
## CHARLES JOHN LUMBER COMPANY

335 P. 2d 399
340 P. 2d 952

*Malcolm F. Marsh* argued the cause for appellants. On the briefs were Marsh, Marsh & Dashney, Salem.

*Carlton R. Reiter* argued the cause for respondents. On the brief were Stern, Reiter, Day & Anderson, Portland.

Before PERRY*, Chief Justice, and LUSK, WARNER and SLOAN, Justices.

SLOAN, J.

Two cases are here consolidated on appeal as they were for trial. Defendants appeal from the decree of the trial court which dismissed defendants' cross complaint entered in each case and which denied the prayer therein for reformation of a contract between the parties for the sale and purchase of timber on lands owned by plaintiffs. For our purposes we will treat the cases as one.

For reasons later appearing we make only limited reference to the evidence. The plaintiffs Scoville are husband and wife. At all times mentioned herein they were the owners of approximately 600 acres of land in Lincoln County. All the land sustained timber to some extent, in part scrubby and of little value and

---

* Chief Justice when case was argued.

some in concentrated sizable growth. The defendants Charles Hampton and John Hampton were brothers and partners in the operation of a sawmill on land adjacent to that owned by plaintiffs, doing business by the assumed name of Charles-John Lumber Company. The successful operation of the mill required, of necessity, the acquisition of timber. On or about May 25, 1951, the parties entered into a written contract by which plaintiffs sold and defendants bought timber standing upon a part of plaintiffs' land. The timber involved was identified by the legal description of the land upon which it stood. Prior to the execution of this contract the parties had conducted negotiations of a cursory character both orally and by correspondence. The latter is in evidence as defendants' exhibits 1, 2 and 3. It is admitted that plaintiffs offered to sell to the defendants the timber standing on any part or all their lands. Certain legal descriptions were set forth in the correspondence mentioned. However, when defendants' attorney prepared the written contract he altered the legal descriptions as written in the letters and inserted in the written contract a description that can be construed as containing less land area than that contained in the correspondence. The contract was submitted to plaintiffs. They considered the terms of the contract including the legal description with their attorney and, finding no fault, executed the contract.

The dispute encompassed in the two cases before us results from this change of description. Defendants, by their cross complaints, allege that both parties executed the agreement with the mistaken intent or belief that the written contract contained the same description as the correspondence. They pray that the written contract be reformed to conform to the de-

scription contained in the correspondence. The plaintiffs assert that there was no mistake upon their part at the time they executed the agreement; that they construed the description in the contract as containing less land than in the correspondence but had no objections thereto and signed it with full recognition of the description and were laboring under no mistake. This is the issue we are called upon to resolve.

The trial was limited to evidence of reformation and the trial court entered a decree in each case denying the remedy and dismissing the cross complaint. The other issues presented by the respective complaints and answers were not heard and determined.

■ There are few areas of equitable jurisdiction wherein the rules of its application have been so well established and consistently followed by this court as the equitable concept of reformation for mutual mistake. *Lewis v. Lewis,* 5 Or 169; *Meier v. Kelly,* 20 Or 86, 25 P 73, to *Weatherford v. Weatherford et al.,* 199 Or 290, 257 P2d 263, 260 P2d 1097. Other decisions of this court and of other jurisdictions are discussed by Mr. Justice RAND in *De Tweede v. Barnett Estate,* 160 Or 406, 85 P2d 361. The rule so consistently followed requires:

> "* * * that in cases of this kind the complaint should distinctly show what was the original agreement and understanding of the parties, and should point out with clearness and precision wherein there was a mistake, and should show that it did not arise from gross negligence of the plaintiff." *Lewis v. Lewis,* supra, p 176.

These allegations must be established with "evidence having a high degree of cogency. A mere preponderance of the evidence does not suffice." *Kontz v.*

*B. P. John Furniture Co.*, 167 Or 187, 205, 115 P2d 319; 3 Pomeroy's Equity Jurisprudence (5th ed) 353, § 859a.

■ We have analyzed the record and find the weight of the evidence to be most evenly balanced. Some of the evidence would tend to weigh heavily in favor of defendants' prayer for reformation. Other testimony and exhibits cause us to believe the plaintiffs have fully established that there was no mistake on their part at the time they executed the questioned contract. Such being the case, we can only agree with the trial court and conclude that defendants have failed to meet the exacting burden of proof they assumed in attempting to establish a reformation of the contract. The defendants relied heavily upon their exhibits 1, 2 and 3 previously mentioned and particularly upon the failure of the trial court to mention exhibit 3 in its memorandum opinion.

Exhibit 3 is a letter written by plaintiff B. H. Scoville to the defendants wherein he acknowledges plaintiffs' willingness to sell timber on a land area described in exhibit 2 which was a letter sent to him by defendants. Defendants contend that these exhibits conclusively prove that the intent of the parties had fully congealed as to the actual legal description of the timber land invloved and a binding contract formed. In the first place this is at variance with the allegations of the cross complaint in which defendants alleged the contract was formed by oral agreement made on September 14, 1950. In addition, other portions of the letter clearly show that plaintiffs were not in accord with other proposed terms submitted by defendants' exhibit 2. Nor does the letter refute the evidence in behalf of plaintiffs that they were agreeable to the description subsequently inserted in the contract and

executed it in full accord therewith and with no mistaken intent.

This is not a case like *Bradshaw v. Provident Trust Co.*, 81 Or 55, 158 P 274, where a mistake made by one party to the contract is knowingly or fraudulently taken advantage of by the other party to the agreement. Here the plaintiffs had every reason to believe the defendants were aware of what they were purporting to buy. And, it should be pointed out that the construction given the description by plaintiffs when they executed the contract was less advantageous to them than the description contained in the exhibits mentioned. The contract provided that the amount of timber on the land described was to be determined by a mutual cruise and the plaintiffs were to be paid for the amount of timber thereby found to be on the land. The payment was to be made whether the defendants removed the timber or not. Consequently the less timber included in the contract the smaller the payment to be received by the plaintiffs. Under these circumstances it certainly cannot be said that they were taking any advantage of the defendants.

■ Nor is this like the situation, for example, of a purchaser of land who intends to buy and pays for a section of land. The deed is prepared by the purchaser and, by inadvertence, he describes something less than a section. A vendor who would sign and deliver the deed in that situation, knowing of the deficiency in the description, could not be heard to say that the purchaser was bound by his deed. Such conduct is tantamount to fraud. *De Tweede v. Barnett Estate*, supra (160 Or at 417). This case is just the opposite. Here the contract called for the sale of less timber than plaintiffs had been willing to sell. In fact, by the

description in the contract plaintiffs could then have considered that they were left with scattered blocks of timber that would be difficult to sell to any other buyer. However, they had agreed to sell any or all of the timber and in keeping with that belief signed the contract with the specific intent to sell the precise timber described therein. We cannot find that this was a mistaken intent or a fraudulent one. The decree is affirmed.

## ON REHEARING

*Francis E. Marsh,* McMinnville, argued the cause for appellants. With him on the brief were Marsh, Marsh & Dashney, Salem, and Malcolm F. Marsh, Salem.

*Carlton R. Reiter,* Portland, argued the cause for respondents.

Before McAllister, Chief Justice, and Lusk, Warner, Perry, Sloan, O'Connell and Crawford, Justices.

O'CONNELL, J.

This case was first heard by the court sitting in department. Upon petition for rehearing the case was heard en banc. After a re-examination of the case by the entire court we are convinced that our former decision should not stand and that the contract in question must be regarded as including the sale of timber on the NE ¼ of Section 15.

■ We held that the defendants had failed to meet the burden of proof required in a suit seeking the reformation of a contract. We are now of the opinion that the defendants have met this burden by establishing that the essential terms of a contract existed prior to the final writing which memorialized it, and which contained the ambiguity now sought to be resolved by "reformation." We proceed on the theory expressed in our former opinion that one who seeks reformation for mutual mistake must establish his case with "evi-

dence having a high degree of cogency." The evidence in the instant case meets this test. It was as follows:

The parties first met in 1949 when the defendants purchased from Charles Carter a sawmill located on the plaintiffs' land. Soon thereafter the plaintiff, B. H. Scoville, was employed by the defendants in the latter's mill. Sometime prior to July 25, 1950 the defendants discussed with Scoville the possibility of purchasing the timber on the plaintiffs' lands. Scoville told the defendants that he would sell to them all of his timber. At that time one of the defendants suggested that Scoville furnish them with information as to the location of the *better part* of the timber. On July 25, 1950 Scoville wrote the following letter:

> "Elk City, Oregon
> July 25, 1950
>
> Charles John Lbr. Co.
>    Portland Oregon
>
> Gentlemen
>    Acting upon your suggestion I made an attempt to procure a map to mark the areas on our property where the timber was located. However, no map was immediately available so I took discriptions [sic] and names as they are listed in the Metsger atlas which I believe you have. They are as follows:
> E ½ of SE ¼ of Sec. 10, T 11—R 10 (Pearl Thompson)
> U S Lot No 10—Sec 11—T 11—R-10 (adjacent to Pearl)
> U S Lot No 11—Sec 11—T 11—R-10 (Thompson—near river)
> SW ¼ of SE ¼ of Sec 10—T 11—R 10)
> *NE ¼ of Sec 15—T 11—R 10*          ) R A Abbey
> NW ¼ of SE ¼ Sec 15—T 11—R 10
>
>    Hope this discription [sic] will help you to locate it on your map.

The main body of timber lays on lots 10 and 11 and the 80 listed to Pearl Thompson.

> Very truly yours
> (sgd)  B H Scoville & wife
> Elk City Ore"

(Italics supplied)

It is important to note (a) that this letter clearly designates the NE ¼ of Section 15 which the defendants contend was intended to be included in the contract when the description in the contract was prepared by defendants' attorney; (b) that it does not designate the NE ¼ of the SE ¼ of Section 15 which the plaintiffs contend was described by the contract; and (c) that a quarter-quarter section in the SE ¼ of Section was expressly mentioned, i.e., the NW ¼ of the SE ¼ of Section 15.

On September 14, 1950 L. H. Hampton and his son John, one of the defendants herein, went to Scoville's home for the purpose of negotiating for the purchase of Scoville's timber. On cross-examination Scoville admitted that at this meeting all of the terms of the contract were agreed upon except the description and that at that time he received a check for $1,000 as earnest money. The following excerpt from Scoville's testimony makes this clear.

"Q. * * * Now, let's go back to the date that you got the check. You agreed on the price, did you not, at $4.00 [per thousand board feet]?
A. That is right.
* * * * *

Q. And you agreed at that time on the mode of payment, didn't you?
A. A thousand dollars quarterly, that is right.
* * * * *

Q. And you agreed that there was to be a mutual cruise, right?

A. That is right.

Q. And you also agreed that they were to have five years to take it off, isn't that true?

A. That's right, we talked about those things.

Q. And you agreed, did you not, by these letters that the timber on this land was the timber that you were talking about, isn't that true?

A. Well, it was still all for sale.

Q. It might have been all for sale, I don't know, but this is what you sold, isn't it?

A. It was the suggested part of it.

Q. Beg pardon?

A. I suggested that part of it because they asked me the better timber.

Q. That's what they agreed to take, wasn't it, and that is what you agreed to sell, isn't that true, what's in these letters?

A. I agreed to sell it. I agreed to sell all of it.

Q. And they agreed to buy it, isn't that right?

A. Well, I suppose they did. The contract was —was when I finally agreed to sell it and they agreed to buy it.

Q. And isn't it true that the thousand dollars that they paid you on September 14th was a part payment for this timber that is described in these letters?

A. I suppose it would be, yes.

Q. Well, it is, isn't it?

A. Yes, I suppose it would be.

* * * * *

Q. Well, did you agree at that time when they paid you the thousand dollars that they had a right to take every bit of timber on your place?

A. That was right. They wanted all my timber, and I said they could have it all.

\* \* \* \* \*

Q. All right. Just forgetting for a minute the question of the description. The rest of the contract relative to the price of $4.00—I'm talking about Exhibit 4 now—[the written contract] This contract, aside from this description, relative to the price of $4.00; relative to a mutual cruise; relative to the time that you were going to give them to take the timber off, coincides exactly with your discussion that you had back in September of 1950, does it not?

A. Everything excepting the description of the property.

Q. Yes.

A. But there was no description made at that time at all?

Q. So if this is a mistake, it only relates to the description, isn't that true?

A. Why the description is the only part in question here, yes.

Q. Yes, that's the only part in question, and the balance of the contract coincides completely in every detail with the agreement that you reached in September of 1950, right?

A. I suppose it does, yes.

Q. Well, it does, does it not?

A. I think it does. I believe everything is covered here."

It was noted above that at the meeting on September 14, 1950 Scoville received a check for $1,000 as earnest money. On January 19, 1951 Scoville received another check for $1,000. This check bore the notation "Quarterly Payment On Timber Contract." At this time no written contract had yet been drafted.

The next important item of evidence is the follow-

ing letter from the defendants to the plaintiffs dated May 8, 1951:

"May 8, 1951
Mr. and Mrs. B. H. Scoville
Elk City, Oregon

Dear Mr. & Mrs. Scoville:

Our attorney is about to draw up a contract for us to cover the timber purchase agreement, but before proceeding he wanted to be sure that the points were covered conrrectly [sic].

I understand that all the standing timber on the following described land is to be bought by us at $4.00 per thousand. Terms of payment to be $1000.00 quarterly until paid up.

    E ½ of SE ¼ of Sec. 10, T 11, R 10 (Pearl Thompson)

    U.S. Lot No. 10, Sec. 11, T. 11, R. 10 (adjacent to Pearl)

    U.S. Lot No. 11, Sec. 11, T. 11, R. 10 (Thompson —near river)

    SW ¼ of SE ¼ of Sec. 10, T. 11, R. 10)

    NE ¼ of Sec. 15, T. 11, R 10    ) R. A. Abbey

    NW ¼ of SE ¼ of Sec. 15, T. 11, R. 10)

I was not sure whether or not we were to have the timber cruised or whether we had agreed on a footage you estimated to be on this property. Please let me know on this point and if you desire a cruise, we will call in a cruiser immediately.

As I understand it, after the timber is paid for in full there is to be no time limit when all the timber must be logged out as it will all be paid for ahead of time.

We will appreciate your reply by return mail so that we can complete drawing up the agreement and send it along for your approval.

With kindest regards, we remain

                Yours very truly,
                CHARLES-JOHN LUMBER CO.
                John C. Hampton"

JCH:eh

It will be noted that the description set out in this letter is the same as that contained in Scoville's letter to the defendants on July 25, 1950. In response to defendants' letter Scoville wrote the following letter on May 10, 1951:

"Elk City, Ore
May 10, 1951

Mr. John C. Hampton
Portland Oregon

Dear Mr. Hampton

I am writing in answer to your letter of May 8th.

Regarding this discription [sic] of the property, I believe you are about right. There probably is some on other pieces but in no great quantity.

As regards to the "no time limit" feature you mentioned, we could hardly agree to that. When we discussed the matter in the first place—last August—your father suggested 5 years, to which we agreed. Nearly a year of that time has already elapsed. We do not wish to be arbitrary about the matter, but surely that should be sufficient time to take out a patch of timber which would take a few weeks time, at most.

Regarding the cruise: it seems like we would both be safe doing it either of two ways. We could have it cruised as was suggested in the first place. However, I am sure from cruises which were made in 1940 that there is in excess—I don't know how much—of 2 million feet. We could make out the contract for 2 million feet, and any in excess of that amount could be paid for when the timber was taken out. Either plan would be acceptable.

The price agreed upon was $4.00. Have been offered $6.00 since then, by the way.

There is a payment on the mill property payable about now, I think. Have some taxes to pay and we are doing a little repair on our house, so could use some of it at your convenience.

Hope I have covered the points necessary for the drafting of the contract on timber.

Very truly yours<br>B H Scoville"

This letter indicates that Scoville looked over the description in defendants' letter and found that it was "about right." The last letter also confirms the defendants' contention that a five-year removal period and a cruise of the timber had already been agreed on in the meeting of September 14, 1950. Scoville mentions the price of $4.00 "agreed upon," stating that he had been offered $6.00 per thousand for it since that agreement. If he had not regarded himself as bound under the terms of the earlier agreement it is difficult to see why he did not inform the defendants that the $4.00 price was not satisfactory.

After receiving Scoville's reply of May 10, 1951 the defendants had their attorney draw up the formal contract which the defendants now ask to have reformed. The contract was later sent to Scoville and signed by him in his brother's law office on May 25, 1951. For the purposes of this case the essential parts of the contract were as follows:

"The Sellers, for the consideration hereinafter mentioned, promise to sell to the Purchaser, and the Purchaser agrees to buy from the Sellers all of the merchantable timber standing, lying and being on the following described real premises, to-wit:

The East $\frac{1}{2}$ of the Southeast $\frac{1}{4}$ and the Southwest $\frac{1}{4}$ of the Southeast $\frac{1}{4}$ of Section 10; U. S. Government Lots Nos. 10 and 11 in Section 11; the Northeast $\frac{1}{4}$ and the Northwest $\frac{1}{4}$ of the Southeast $\frac{1}{4}$ of Section 15; all in Township 11 South of Range 10 West of the Willamette Meridian in Lincoln County, State of Oregon.

for the sum of FOUR DOLLARS ($4.00) per THOUSAND FEET, based on the cruise of a competent, qualified timber cruiser acceptable to Sellers and Purchaser; Sellers acknowledge receipt of the sum of Two Thousand Dollars ($2,000.00) heretofore paid by Purchaser in installments of One Thousand Dollars ($1,000.00) each, paid during the months of September 1950 and January 1951; the balance of said purchase price is to be paid $1,000.00 upon the execution of this agreement and $1,000.00 quarter-annually thereafter until the full purchase price as determined by said cruise, has been paid.

It is understood and agreed that this sale and purchase is upon the following terms and conditions:

1. That the Purchaser will have 5 years from the date hereof within which to remove said timber, and upon the expiration of said time, all the rights of the Purchaser in and to any timber remaining upon the above described premises shall cease and terminate.

2. That the Purchaser shall have the right of ingress to and egress from said premises and shall have the right to enter into and upon said premises, to use existing roads and to construct such additional roads as may be required and to do any other act necessary in connection with its logging operation and the removal of said timber or lumber manufactured therefrom.

\* \* \* \* \*

5. It is understood and agreed that in the event the Purchaser shall fail, neglect or refuse to pay the quarter-annual installments when called for for a period of thirty days from their due dates, and if such default is not corrected within fifteen days after notice in writing from the Sellers of said default, then sellers may, at their option, cancel and terminate this agreement, and all rights of Purchaser in and to the remaining timber, standing,

lying or being on said premises, shall cease and terminate.

6. In the event suit or action is instituted to enforce any of the provisions of this contract, it is understood and agreed that the prevailing party in such suit or action shall be entitled to such sum as the Court may adjudge reasonable as attorney fees in addition to statutory costs and disbursements."

In preparing the contract the defendants' attorney referred to the description referred to in the letters set out above. He testified that he combined the description of all the property in Section 15 and thereby produced the ambiguous description in the contract. In proofreading the description in the contract with the description in the letter of July 25, 1950 from Scoville he checked off the separate items of description in the letter with a pencil check mark. These marks appeared on the letter when it was received in evidence.

In addition to the foregoing circumstances leading up to the formal execution of the contract there was other evidence indicating that the timber on the Northeast Quarter of Section 15 was intended to be included in the sale. The cruise sheets which were introduced in evidence show that the cruise was made on the same land as that described in the correspondence between Scoville and the defendants, including the NE ¼ of Section 15. No cruise was made of the NE ¼ of the SE ¼ of Section 15. The defendants testified that the cruiser was agreed upon by the parties after the contract was signed, but Scoville denies that he was ever consulted on the matter. The cruise was made in February, 1952. Scoville testified that he did not receive a copy of the cruise sheets until sometime after August 21, 1953 when he received the last quarterly payment on the contract. He admits that he received

it before the defendants started cutting which was in the Fall of 1954. He testified that he did not call to the defendants' attention the claimed discrepancy between the cruise sheet and the contract because, although he requested a copy of the cruise sheet, he did not look at it when he received it. He admitted that he knew that the defendants would log on the basis of the cruise sheet. It is difficult to believe that the plaintiffs attached no more significance to the cruise than they now claim.

On December 6, 1954 the plaintiffs sought a preliminary injunction against the defendants to prevent them from logging further on the plaintiffs' lands. The basis upon which the injunction was sought can be gathered from a letter sent by B. H. Scoville's brother, S. E. Scoville, who was an attorney. The last paragraph of the letter reads as follows:

"This Notice is intended to make it clear to you that my clients contend that this Timber Contract has been voided by you by reason of your attempt to log subject timber without your complying with the specefied [sic] manner of cruising subject timber but that my Clients agree to permit you, only, to log that amount ot [sic] timber, for which you have paid at the rate of $4. per thousand, and by which amount you have so limited your rights to any and all remaining timber on subject premises."

We think that it is significant that although the letter expresses the plaintiffs' dissatisfaction with the cruise, it did not contain any indication that the cruise was run on an area not agreed upon in the contract. The cruise sheets were introduced into evidence by the plaintiffs in the proceeding on December 6, 1954 referred to above.

The cruise sheets vividly portrayed in color the quarter sections covered by the cruise. Since these sheets were in the plaintiffs' possession and were used by them in the injunction proceeding it is difficult to believe that they did not observe the cruised area marked on the sheets.

Scoville testified that when he went over the contract in his brother's law office he regarded the contract as excluding the NE ¼ of Section 15 which would mean necessarily that he interpreted the reference to the NE ¼ as meaning the NE ¼ of the SE ¼. Since the NE ¼ of the SE ¼ was excluded from the descriptions contained in Scoville's letter to the defendants and in the defendants' letter in reply it seems strange that Scoville would not at least look at the cruise sheets to see if a mistake might have been made. This is especially surprising in view of the fact that the description in the contract could be construed either way, i.e., as either including or excluding the NE ¼ of Section 15.

The testimony is conflicting as to whether Scoville knew that logging operations were being conducted on the NE ¼ of Section 15. As already stated, the logging operations did not begin until the Fall of 1954. Tom Dundas, who had contracted to log the timber on the Scoville property for the defendants, testified that he had logged approximately 350,000 feet of timber on the NE ¼ of Section 15 prior to the injunction hearing in December, 1954; that timber cut from this quarter section was cold decked on the north part of it (although he was not certain of the date); and that from time to time during this operation he saw Scoville on the NE ¼ of Section 15. Scoville denied that timber was cut on the NE ¼ of Section 15 prior to December, 1954. He contended that the cold deck re-

ferred to above was made up of logs cut from land other than the NE ¼ of Section 15. Ralph Wilkinson, employed by the plaintiffs to make a cruise of the timber on his land, testified that there was no cold deck on the NE ¼ on December 16, 1954.

The plaintiffs point to the fact that the defendants logged on the NE ¼ of the SE ¼ (designated on maps as U. S. Lot 6 because the quarter-quarter section is incomplete, a part of it being covered by the Yaquina River) and argue that this fact indicates that the defendants regarded the contract as including this area, from which it could be inferred in turn that the defendants regarded the contract as excluding the NE ¼ of Section 15. The evidence is undisputed that the defendants cut timber on Lot 6, about the same time as they began cutting on the land north of the NE ¼ of Section 15. The fact that the defendants began logging operations to the north and to the south of the NE ¼ of Section 15 at the same time is regarded by the plaintiff as further evidence that the defendants understood that the NE ¼ of Section 15 was not included in the contract.

The defendants' witness, Dundas, who logged for them, testified that thirty or forty trees were cut on Lot 6 for the purpose of letting in the sun and wind to dry the logging road at that point. The road ran from the mill through Lot 6, through the NE ¼ of Section 15 and into the timber on the northern part of Scoville's land included in the contract. Scoville testified that not more than a dozen trees shaded the road and that most of the trees which were cut did not shade the road. Thus we have a direct conflict of testimony on this point.

The foregoing constitutes the essential parts of the evidence reflecting upon the formation of the contract

in question and the practical construction placed upon it by the parties. Looking at the evidence as a whole we are firmly convinced that the parties intended to include in the contract of sale the NE ¼ of Section 15 and that our former decision must be changed. The essential elements of a complete and binding contract existed after the exchange of the letters between the plaintiffs and the defendants. The mistake made by the defendants' attorney left the written contract ambiguous, rendering it equally susceptible to either of two interpretations, i.e., that it included the NE ¼ of Section 15 or that it did not but rather included the NE ¼ of the SE ¼ of Section 15.

We are of the opinion that the plaintiffs' evidence, designed to establish that he understood the description in the contract to exclude the NE ¼ of Section 15, is so greatly overbalanced by evidence indicating a contrary understanding that we must resolve the ambiguity in favor of the defendants. The evidence clearly shows that prior to the execution of the written contract the parties had agreed upon the area from which the defendants would be privileged to cut timber. The plaintiff's explanation that he interpreted the ambiguous description in the written contract to mean that the defendants had selected out of all of plaintiffs' lands a quarter-quarter section which had never been mentioned by the parties in their correspondence relating to the timber lands to be included in the contract, is so implausible in the face of the contrary evidence that we cannot accept it. We have reached this conclusion after a thoroughgoing de novo appraisal of the record. We conclude therefore that the contract must be interpreted to include the NE ¼ of Section 15 and that the defendants' prayer for "reformation" must be granted. Therefore, we withdraw our former

opinion and order that the two cases consolidated on this appeal be reversed with directions that the proceedings in case number 14-029, which is an action of trespass, be perpetually enjoined and that case number 13-350 be remanded for further proceedings not inconsistent with this opinion.

SLOAN, J., dissenting.

The original decision of this court was correct. This is not said because of any tenacious or stubborn desire to cling to my former opinion. It is simply a continuing view that the evidence does not establish a *mutual* mistake. The defendants alleged, and vigorously argued, that an oral contract was consummated on September 14, 1950. The majority appears to accept this contention. However, the letters set forth in the majority opinion, and heavily relied on, clearly demonstrate that the precise terms of a contract were not agreed to on that date. In fact the letters further demonstrate that the terms were not fully concluded and agreed upon at the date of the last letter. To establish reformation it is essential that the precise terms of the contract sought to be enforced are alleged and proved. *Lewis v. Lewis,* 5 Or 169. The only actual contract between the parties was the one finally executed.

The evidence established that the plaintiffs dealt with the defendants in good faith throughout the entire transaction and left the determination of the timber to be purchased entirely with the defendants. When they executed the contract they did so in honest belief that the defendants had described the land intended. There was no mistake on their part and no way that the majority can accurately adjudge the evidence and determine otherwise.

The evidence relied on by the majority of the conduct of the parties subsequent to the execution of the contract is evidence of the construction placed upon an ambiguous contract by the parties. It has no bearing or evidentiary value to fix the terms of a prior oral contract. The defendants have not met the test of *alleging* and proving the complete terms of an enforceable prior agreement.

It should be remembered that this is an action for trespass initiated by the plaintiffs. The issue determined here was upon the equitable affirmative answer of the defendants. The issue of trespass remained undecided. By the former opinion of the court the issue of the proper construction to be placed upon the contract was still undecided. The defendants still had available to them the defense that the description could be construed as contended for by the defendants. In other words, this is not a reformation case. The real issue was and remains the proper construction to be placed upon an ambiguous description. The case should be affirmed and the parties left to contest this real issue. For these reasons I dissent.