Argued and submitted August 8, 2002, affirmed April 24, 2003

PIONEER RESOURCES, LLC,
an Oregon limited liability company;
and Frontier Resources, LLC,
an Oregon limited liability company,
*Respondents,*

*v.*

D. R. JOHNSON LUMBER COMPANY,
an Oregon corporation;
and Rudio Mtn. Limited Partnership,
an Oregon limited partnership,
*Appellants,*

*and*

UNITED STATES NATIONAL BANK OF OREGON,
*Defendant.*

94-05-151CV; A110085

68 P3d 233

342

Ridgway K. Foley, Jr., argued the cause for appellants. With him on the briefs was Greene & Markley, P.C.

Gary M. Bullock argued the cause for respondents. With him on the brief were Tonya Kowalski and Bullock and Regier, P.C.

Before Haselton, Presiding Judge, and Linder and Wollheim, Judges.

HASELTON, P. J.

## HASELTON, P. J.

Defendant D. R. Johnson Lumber Company (D. R. Johnson) appeals from a judgment in favor of plaintiff Pioneer Resources, LLC (Pioneer), that reformed the parties' timber sale contract, ordered defendant to reconvey certain property to plaintiff, and awarded plaintiff damages of approximately $2 million for timber trespass and other losses resulting from defendant's alleged wrongful acquisition of the property.[1] Defendant assigns error to the trial court's grant of reformation and award of damages, arguing, *inter alia*, that the parties' release agreement (Mutual Release) bars plaintiff's claims, and, in the alternative, that plaintiff failed to prove the elements of reformation. As discussed below, we conclude that the parties' Mutual Release does not bar relief. We further conclude that the parties' antecedent agreement with respect to the property to be conveyed is the property description of the "Timberland Sale Term Sheet." Finally, we conclude that plaintiff proved all elements of reformation—and, particularly, that plaintiff's failure to review certain documents pertaining to the underlying transactions was not grossly negligent. Consequently, we affirm.

■ We review the allowance of reformation *de novo*. Nevertheless, because of "the trial judge's superior position from which to assess credibility * * * we give substantial weight to the trial court's findings where, as here, those findings hinge on the resolution of conflicting testimony and the credibility of the witnesses." *Foster v. Gibbons*, 177 Or App 45, 48 n 1, 33 P3d 329 (2001) (citation omitted). We find, and recount, the following material facts consistently with that standard.[2]

This litigation, at its core, concerns the ownership of timberland in Townships 7 and 8 South in Grant County.

---

[1] Although Rudio Mtn. Limited Partnership is also denominated as an appellant and Frontier Resources, LLC, is also denominated as a respondent, those parties appear to be affiliates of D. R. Johnson and Pioneer, respectively, and advance no distinct arguments. Accordingly, for convenience and clarity, "defendant" in this opinion refers to D. R. Johnson and "plaintiff" refers to Pioneer.

[2] Additional facts pertaining to particular assignments of error are set forth in the discussion of those assignments.

Although the parties dispute the legal significance of their actions and dealings, most of the material facts relating to the conveyance of those properties are undisputed.

In the early 1990s, a change in federal forest management policy led to a significant decrease in the amount of timber on public lands made available for commercial use, with a concomitant increase in the demand for other sources of timber. In response to that market dynamic, in November 1993, four men who ultimately formed Pioneer—Greg Demers, Ed King, and Melvin and Norman McDougal—negotiated an Asset Purchase Agreement with Kinzua Corporation to purchase all of Kinzua's timber-related assets for $130 million. Those assets included approximately 180,000 acres of land in eastern Oregon, which contained about 800 million board feet of timber. Thereafter, the four principals formed Pioneer to conclude the acquisition. Under the Pioneer-Kinzua agreement, Kinzua was to continue to operate in the normal course of business, including the acquisition of more land, until the sale closed.

Pioneer's lender in the Kinzua transaction advised Pioneer that if, at the time of closing, it simultaneously sold off at least $60 million worth of its Kinzua timberland, the lender would substantially reduce Pioneer's required cash contribution. Consequently, in early 1994, Demers began negotiating with Louisiana-Pacific, Boise Cascade, and defendant D. R. Johnson in an effort to sell some of the timberland Pioneer would acquire from Kinzua.

Demers first met Don Johnson (Johnson), defendant's majority owner, in January 1994. At that time, Demers gave Johnson a map highlighting Kinzua's holdings, which had been pieced together from several maps provided by Kinzua. On the map, Demers drew a red circle around an area in Townships 10, 11, and 12 South in Grant County, which the parties referred to as the "Rudio Mountain Tract." Demers wrote on the map his estimate that the tract contained about 60,000 acres and about 220 million board feet of merchantable timber. The circled area did *not* include the land in Townships 7 and 8 in Grant County that is the subject of the parties' present dispute.

Johnson indicated that he also wished to acquire scattered parcels close to the Rudio Mountain Tract. The parties referred to those areas, some of which were in Wheeler County, as the "satellite" parcels. All of the land within the circled area and all of the satellite parcels were located in Townships 10, 11, and 12 in Grant and Wheeler Counties.

Later in January 1994, Demers and Melvin McDougal met with Don Bryan, the owner of a timber brokerage firm, who had been hired by Johnson to help negotiate the transaction with plaintiff. Demers gave Bryan a copy of the same map that he had given to Johnson and circled the same area identifying the Rudio Mountain Tract. In later meetings, but before defendant made its written offer to buy the Rudio Mountain Tract, the land and timber estimates were revised from 60,000 acres and 220 million board feet to approximately 40,000 acres and 200 million board feet of merchantable timber.

On February 14, 1994, Bryan sent Demers a written offer on behalf of defendant to purchase "Rudio Mountain, including all former Kinzua lands in following [T]ownships 10, 11 and 12 South, W.M.," for $60 million. Pioneer did not accept that offer, and it expired according to its terms the next day.

Over the course of the next week, and after further negotiations between the parties regarding price, Bryan and Mark Eves, defendant's attorney, prepared a "Timberland Sale Term Sheet" (Term Sheet), expressing the basic terms of a verbal agreement between Bryan and Demers. The final Term Sheet was faxed to Larry Gildea, plaintiff's attorney. That document specified a purchase price of $60 million and described the property to be conveyed as

"the current Kinzua holdings in [T]ownships 10, 11 and 12 South located in Grant County and Wheeler County, Oregon, consisting of approximately 40,000 acres, commonly referred to as the Rudio Mountain tract (the Timberland) * * *."

Because the Term Sheet included a clause requiring the parties to enter into a binding sales agreement to replace the Term Sheet within five days of signing, the parties decided to

forgo executing the Term Sheet in favor of creating a formal agreement.

Gildea then prepared a draft sales agreement and sent it to Bryan's office. On February 21, Bryan's office forwarded the draft to Eves who had, by then, replaced Bryan as defendant's chief negotiator on the transaction. The draft identified the property to be conveyed as a "40,000 acre, more or less, tract of land" known as "the Rudio Mt. Tract * * * located in Townships 10, 11, and 12 in Grant and Wheeler Counties, Oregon." On February 28, Eves sent a fax to Gildea in which he stated:

> "Initially we had a one page agreement to be signed first, with a more comprehensive agreement to follow. At your request, we have gotten directly into the comprehensive agreement. * * * It is now time to either sign an agreement or terminate discussions."[3]

Eves also sent a revised draft, which included the reference to "40,000 acre[s]" but changed the description of the Rudio Mountain Tract to state:

> "For purposes of this Agreement, the Rudio Mt. Tract shall include all properties of the Kinzua Corporation * * * located in Wheeler County south of the John Day River, together with *all properties of the Kinzua Corporation * * * located in Grant County, Oregon.* Such property shall include, without limitation, property located in Townships 10, 11, and 12 South in Grant County and in Wheeler County, Oregon."[4]

(Emphasis added.)

Because the change in the draft would require plaintiff to sell to defendant "all" the land in Grant County that it purchased from Kinzua, Gildea consulted with Demers to

---

[3] The trial court found, and we agree, that the "one page agreement" to which Eves referred was the Term Sheet—and not, as Eves testified, some other document.

[4] At trial, Gildea testified that, when he asked Eves about the reasons for the change in the description of the property to be conveyed, Eves responded that it was necessary to make sure that defendant got all of the scattered parcels around Rudio Mountain. Eves denied that he ever said that and, instead, testified that he explained the change to Gildea as based on his client's belief that "Kinzua had a lot more land within Grant County than what the map was showing * * *." The trial court determined that Gildea's account was credible.

make sure that the only land Kinzua owned in Grant County was the land in Townships 10, 11, and 12. Demers believed that plaintiff was not acquiring any Kinzua land in Grant County north of the John Day River[5] and, consequently, agreed to the change in the description of the property. Gildea also consulted with Melvin McDougal about the proposed change. Based on a misreading of the map, McDougal mistakenly agreed with Demers's assessment that the only land in Grant County that plaintiff was to acquire from Kinzua was that in Townships 10, 11, and 12.

On March 3, 1994, plaintiff and defendant signed a Sales Agreement, which provided, in part:

"Pioneer, as a part of a larger purchase from Kinzua Corporation and Kinzua Owners, is acquiring a 40,000 acre, more or less, tract of land which includes approximately 200 MMBF of merchantable timber 8" DBH or greater. It is sometimes known as the Rudio Mt. Tract. Johnson and Pioneer have agreed that Johnson shall purchase from Pioneer and Pioneer shall sell to Johnson the Rudio Mt. Tract upon the terms and conditions set forth in this Agreement.

"THE PARTIES AGREE:

"1. Sale. Pioneer agrees to sell and Johnson agrees to purchase the Rudio Mt. Tract referred to in the foregoing recital. For purposes of this Agreement, the Rudio Mt. Tract shall include all properties of the Kinzua Corporation and Kinzua Owners which are located in Wheeler County south of the John Day River, together with all properties of the Kinzua Corporation and the Kinzua Owners which are located in Grant County, Oregon. Such property shall include, without limitation, property located in Townships 10, 11, and 12 South in Grant County and in Wheeler County, Oregon."

The Agreement also provided that defendant had the right to request a timber cruise of the merchantable timber located on the property. If the cruise showed less than 200 million board feet of merchantable timber, plaintiff would be

---

[5] Townships 10, 11, and 12 in both Grant County and Wheeler County are located south of the John Day River. Townships 7 and 8 in Grant County, the location of the now-disputed timberland, are located north of the John Day.

required to pay defendant for the shortfall or to provide "comparably accessible timber * * * which is located within 75 miles of Prairie City, Oregon." The Agreement specified that closing was to occur no sooner than April 15 and no later than June 30, 1994.

On March 9, Gildea sent Eves a letter in which he stated, "[t]he Grant County Property, if I understand things correctly, includes all of the descriptions in the preliminary report from Grant County Title." Attached to that letter was a copy of a preliminary title report describing the Grant County property that would be conveyed in the Kinzua-Pioneer transaction. The legal descriptions in that preliminary title report included the now-disputed timberland in Townships 7 and 8. Gildea had not reviewed the title report and continued to believe that plaintiff was selling only Rudio Mountain and the nearby satellite properties to defendant.

On March 11, Bryan informed Demers that defendant was invoking its contractual entitlement to a timber cruise. One of Bryan's employees prepared a list of properties that were to be cruised—and, in doing so, attached the legal descriptions from the preliminary title report, but crossed out Townships 7 and 8 because he understood from Bryan that those properties were not part of the transaction.

Ultimately, on March 30, Eves sent Gildea a letter along with a copy of Bryan's property list—which, again, did not include the property in Townships 7 and 8—and a map showing only land in Townships 10, 11, and 12. In the letter, Eves stated that he had "enclosed * * * a copy of a map which describes all of the properties included in the Rudio Mountain purchase * * * [and] a typed listing of all the properties to be conveyed as a part of Rudio Mountain * * *." With plaintiff's approval, Bryan provided his property list to the firm performing the cruise, as the basis for the cruise.

On April 7, as the cruise progressed, the parties met to discuss a likely shortfall of timber. Defendant expressed interest in harvesting timber from Tract III, the area where much of the now-disputed property in Townships 7 and 8 is located, to make up for any shortfall.

On April 8, Bryan reviewed the preliminary title report for the Kinzua-Pioneer transaction and discovered the descriptions of the properties in Townships 7 and 8. Bryan then met with Eves to tell him of his discovery. Bryan told Eves that "this was not right" and that the land should be excluded from the property defendant would acquire because that area "was not cruised as agreed in the contract, and would amount to about 4,000 [additional] acres." Eves replied that, when he took over the negotiations for defendant, the property description was changed to refer to all of Grant County. A few days later, Bryan revisited the issue and told Eves that it would look as if defendant was trying "to slip something by" because the property in Townships 7 and 8 was not included in the cruise list that defendant had prepared and provided. Eves responded that he was too busy to discuss the matter.

Also on April 8, Gildea wrote to Eves, rejecting the cruise because of the methods used. Gildea then wrote to the firm performing the cruise, instructing it to make cruise calculations both with a new proposed method and according to the earlier instructions.

On April 11, Eves wrote to Melvin McDougal, declaring that the Sales Agreement had been breached and demanding that plaintiff fulfill its contractual obligations. Gildea replied for plaintiff that the two parties should close the agreement as scheduled, regardless of the timber volume on the land, and work out any shortfall agreement at a later time.

On April 13, Gildea wrote to Eves, again confirming plaintiff's intent to close pursuant to the terms of the Sales Agreement. In that letter, Gildea proposed three settlement alternatives, including one in which the purchase price of the Rudio Mountain Tract would be reduced to $45 million and each party would sign an agreement releasing the other from "claims or liabilities arising from the transaction to the date of closing."

Later that day, Gildea informed Eves that one of the other settlement proposals, under which plaintiff would sell defendant both the Rudio Mountain property and Tract III for a total of $100 million, was no longer available because of

negotiations with other parties for the sale of Tract III. Despite the fact that Tract III included portions of the now-disputed land in Townships 7 and 8, Eves did not object or assert that Tract III could not be conveyed to others because it included property that defendant would acquire under the Sales Agreement.

On April 14, Eves informed Gildea that defendant would accept plaintiff's offer to reduce the purchase price and sign a mutual release. Eves faxed Gildea an initial draft of an Amended Sales Agreement and, soon after, faxed a new page 1 correcting a typographical error that described the Rudio Mountain Tract as consisting of "40 acres," rather than 40,000.

Eves's April 14 draft provided that the property was "more particularly described" in attached preliminary title reports. Those title reports included legal descriptions of the properties in Townships 7 and 8. Gildea asked Eves why he wanted to take the unusual step of attaching the entire preliminary report to the Amended Sales Agreement. Eves responded that he wanted to make sure that there was no misunderstanding regarding the land to be conveyed. Demers approved the draft and authorized Gildea to proceed.

On April 15, Gildea faxed Eves a letter requesting a few changes to the second page of the draft. He also reiterated that plaintiff wanted a mutual release and provided suggested language for that release. Eves subsequently prepared a mutual release that included the same language, in all material respects, as that suggested by Gildea. Later that afternoon, Eves faxed to Gildea what he described as a "revised" version of the Amended Sales Agreement. As there had been no discussion between Eves and Gildea about any changes to page 1, and Eves did not indicate that any such changes had been made, neither Gildea nor Demers read page 1 of the Amended Sales Agreement. Because Demers had requested changes to page 2, he read that page.

The parties signed both the Amended Sales Agreement and the Mutual Release at approximately 5:30 on the afternoon of April 15. On that same day, plaintiff also closed

the Kinzua-Pioneer agreement, as well as sales transactions with Louisiana-Pacific and Boise Cascade.

What neither Demers nor Gildea—nor anyone else associated with plaintiff—knew at the time that plaintiff executed the two agreements was that Eves had, in fact, made significant changes to the first page of the final version of the Amended Sales Agreement. The pertinent portion of the penultimate draft of the Amended Sales Agreement had read as follows:

"(2) Pioneer agrees to sell and Johnson agrees to purchase all of the real property, standing timber, timber rights, and improvements to real property which Kinzua Corporation * * * may have which is located in Grant County, Oregon and Wheeler County, Oregon south of the John Day River. Such real property consists of approximately 40,000 acres. The property is more particularly described in the enclosed Preliminary Title Reports which are attached hereto as Exhibits 'A' and 'B.' "

On the first page of the final draft signed by the parties, Eves had inserted at least 49 additional words—but the page margins were adjusted in such a way that page 2 began with exactly the same text as it had in the previous draft. That is, anyone reviewing only page 2 would have had no reason to suspect that page 1 had been materially altered.

As altered by Eves, the description of the land to be conveyed read as follows:

"(2) Pioneer agrees to sell and Rudio agrees to purchase all of the real property, standing timber, timber rights and improvements to real property which Kinzua Corporation * * * may have *which is located in (a) Grant County, Oregon, and (b) Wheeler County, Oregon south of the John Day River*. The property is more particularly described in the enclosed Preliminary Title Reports which are attached hereto as Exhibits 'A' and 'B,' *and which are incorporated herein by reference*."

(Emphasis added.) Thus, in altering the first page without notice to plaintiff, Eves, as defendant's agent, (1) rewrote the description of the land so that the qualifying phrase "south of the John Day River" explicitly referred only to the Wheeler

County property;[6] (2) removed the phrase describing the property as composed of "approximately 40,000 acres"; and (3) changed the language to explicitly incorporate into the contract the attached preliminary title reports, which included the property in Townships 7 and 8.

Soon after the parties signed the Amended Sales Agreement, an angry ranch owner in Grant County called plaintiff to inquire why defendant was claiming to own both his timber and his land. The ranch was located in Township 8 in Grant County, and the title company had erroneously changed the description in the deed to transfer fee title, rather than just the timber deed that Kinzua had earlier purchased from the ranch owner. Because of that development, plaintiff first became aware that defendant was taking the position that it had acquired the now-disputed timberland in Townships 7 and 8 under the Amended Sales Agreement.

In May 1994, plaintiff filed this action seeking, on a variety of theories, to compel defendant to reconvey the land and timber in Townships 7 and 8. Plaintiff's Fourth Amended Complaint, filed in December 1996, narrowed the dispute to a claim for reformation of the Amended Sales Agreement to conform to the antecedent agreement between the parties, and for related damages. Plaintiff argued that the conveyance of land and timber in Townships 7 and 8 resulted either from mutual mistake by plaintiff and defendant or from plaintiff's unilateral mistake coupled with defendant's inequitable conduct.

In response, defendant asserted, in part, that (1) the parties' Mutual Release barred the reformation claim; (2) plaintiff was not entitled to reformation based on any "unilateral mistake" as to the property conveyed; (3) alternatively, plaintiff's "gross negligence" with respect to the alleged "mistake" precluded reformation; and (4) if the court ordered reformation with the original Sales Agreement as the antecedent agreement, defendant, by way of counterclaim, was entitled to recover damages from plaintiff under the Sales Agreement.

---

[6] As noted, the property in Townships 7 and 8 is located *north* of the John Day River in Grant County.

The case was tried to the court in June 1997. Following an extensive trial, in which the parties presented more than two dozen witnesses and submitted approximately 200 exhibits, the court issued a letter opinion with comprehensive findings and conclusions. That opinion, the court's later letter opinion awarding supplemental damages, and six related letter opinions—all of which the trial judge generated over approximately two years—total nearly 100 single-spaced pages.

In its initial letter opinion, dated January 20, 1998, the court determined that plaintiff had proven "unilateral mistake," *i.e.*, that plaintiff did not intend to sell land in Townships 7 and 8, and had honestly, though mistakenly, believed that that land was not conveyed by the Amended Sales Agreement. The court further found that defendant had acted inequitably because defendant had been aware of plaintiff's mistake by no later than April 8, 1994, and had thereafter "initiated a course of conduct designed to conceal the mistake from plaintiff, while preparing documents to take advantage of plaintiff's mistake." In particular, the court found that defendant had

> "altered the Amended Sales Agreement terms (adding the phrase 'all the land in Grant County') so it could later claim that the parties had agreed to transfer Townships 7 and 8. That language change was a last-minute change, made within the last four hours of a very complex sales transaction. That change * * * was not expressly or directly disclosed or discussed with plaintiff's agents. The prior negotiation practice of the parties had been to identify any change and to identify where the changed language could be found. Defendant misled plaintiff. The Court further concludes that plaintiffs had every reason to believe that the language 'all the land in Grant County' was only a reference to the satellite parcels around the Rudio Mountain property. This belief was based, at least in part, upon the parties' previous discussions of the satellite properties and upon the 2-22-94 discussion between Eves and Gildea."

Finally, the court determined that plaintiff had proven that it had not been grossly negligent in executing the final version of the Amended Sales Agreement. In particular, the court concluded that, although plaintiff's agents were

negligent in failing to review and corroborate documentation with respect to the negotiation and execution of the Amended Sales Agreement, that default did not constitute "gross negligence." Alternatively, the court determined that, given defendant's "inequitable conduct," even gross negligence on plaintiff's part would not preclude reformation:

> "[E]ven if plaintiff's negligence were 'gross negligence,' the defendant's knowledge of the mistake and concealment of the contract change intended to take advantage of plaintiff's mistake, lead this Court to conclude that, on the facts of this case, even 'gross negligence' would not be a bar to reformation."

As a result of those determinations, the court concluded that reformation was appropriate. The court then reformed the property description in the Amended Sales Agreement to exclude the disputed land and timber on Townships 7 and 8 and ordered defendant to reconvey that property to plaintiff.[7] The court later awarded plaintiff over $2 million in damages,[8] as well as litigation expenses and attorney fees.[9]

On appeal, defendant raises two assignments of error. The first raises challenges to the trial court's allowance of reformation, and the second challenges the trial court's award of damages to plaintiff and its failure to award damages to defendant. With respect to the first assignment,

---

[7] Plaintiff argued at trial that the antecedent agreement with respect to the property to be conveyed was expressed in a verbal agreement reached between Demers and Bryan on or about February 21, 1994, the essential terms of which were included in the final Term Sheet. Although the trial court determined that the Sales Agreement was the antecedent agreement to which the property description in the Amended Sales Agreement should be reformed, it also concluded that "[t]he Term Sheet and the Sales Agreement *are essentially the same*" and, therefore, "[f]or all practical purposes, whether it is the Term Sheet or the Sales Agreement, *the outcome is the same*." (Emphasis added.) We discuss the propriety of that conclusion, and its implications, below. *See* 187 Or App at 365-66.

[8] The award of damages corresponded to plaintiff's alleged losses from defendant's cutting of timber on the disputed property, from plaintiff's inability to cut the remaining timber on the property in a favorable market, and from plaintiff's general loss of use of the property.

[9] The trial court awarded plaintiff attorney fees and costs of $1,214,665.49 in a supplemental judgment entered on May 7, 2001. Defendant's challenge to that judgment is the subject of a separate appeal, *Pioneer Resources, LLC v. D. R. Johnson Lumber Co. (A114395)*, 187 Or App 430, 67 P3d 999 (2003).

defendant argues, as it did in the trial court, that plaintiff is not entitled to reformation for any of the following reasons: (1) the Mutual Release bars plaintiff's reformation claims; (2) there was no "unilateral mistake"; (3) any "mistake" was not the result of "inequitable conduct" by defendant; (4) plaintiff failed to prove that it was not "grossly negligent" with respect to its review and execution of the Amended Sales Agreement and related documentation; and (5) in all events, if, as the trial court determined, the original Sales Agreement expresses the parties' antecedent agreement as to the property to be conveyed, defendant is still entitled to prevail because the description of the "Rudio Mt. Tract" in the Sales Agreement unambiguously encompasses the disputed property in Townships 7 and 8. None of those arguments is ultimately availing.

## I. THE MUTUAL RELEASE: ENFORCEABILITY, SCOPE, AND EFFECT

■ We begin with the parties' Mutual Release. If defendant were correct, enforcement of the release would preclude reformation and, consequently, obviate any need to address substantive matters pertaining to reformation. In rejecting defendant's argument that the Mutual Release barred plaintiff's reformation claim, the trial court found it unnecessary to construe the language of the release itself. Instead, employing an estoppel-like rationale, the court concluded that, regardless of the text or plain meaning of the release, defendant's "inequitable conduct" precluded it from enforcing the release:

"This Court earlier determined, during motions against the pleadings, that, if plaintiff could prove that the release agreement was obtained by misrepresentation or concealment, the release would not be a bar or defense to the claim for reformation.

"In its decision, above, this Court found facts and concluded that the Amended Sales Agreement and companion release agreement were obtained by concealment of defendant's (1) knowledge about the fact that Townships 7 and 8 were part of the title reports and (2) changes of the Amended Sales Agreement to take advantage of that knowledge.

"For those reasons, this Court concludes that the release agreement, while it might otherwise be a bar to this entire action, is not a bar to this particular reformation claim."

In response to the trial court's determination, defendant argues that it did not engage in inequitable conduct— and that, even if it had, any such conduct related only to the execution of the Amended Sales Agreement and did not affect plaintiff's execution of the Mutual Release, a separate document, which plaintiff, not defendant, proposed. Like the trial court, we conclude that defendant's conduct—and, especially, Eves's last-minute manipulation of the first page of the Amended Sales Agreement, *see* 187 Or App at 350-52— manifested not merely "inequitable," but egregious, misconduct. We second the trial court's condemnation of such sharp and sleazy practices. Nevertheless, we are constrained to agree with defendant that, because the Amended Sales Agreement and the Mutual Release were separate documents, and because defendant's inequitable conduct so distinctly related to the former and not the latter, that inequitable conduct did not bar enforcement of the release.

██ Releases are a species of settlement agreement and, as such, are favored by the law. *See Walcutt v. Inform Graphics, Inc.*, 109 Or App 148, 151, 817 P2d 1353 (1991), *rev den*, 312 Or 589 (1992). Thus, an otherwise "unimpeachable" release agreement will not be set aside merely because it was improvident. *See Wheeler v. White Rock Bottling Co.*, 229 Or 360, 367, 366 P2d 527 (1961). Nevertheless, under limited circumstances, enforcement of a release may be barred if the release was the product of misrepresentation or unconscionable conduct. *See Raymond v. Feldmann*, 120 Or App 452, 455, 853 P2d 297, *modified on recons*, 124 Or App 543, 863 P2d 1269 (1993), *rev den*, 318 Or 381 (1994).

In particular, enforcement of a release has been barred where (1) the release agreement was unilaterally coerced or imposed and was not the result of arm's-length negotiations between the parties; (2) the party seeking to avoid the release did not have independent representation; or (3) the party seeking to enforce the release misrepresented

the nature, effect, or scope of the release agreement, or mis-led the other party about the value or merit of an asserted legal claim. *See, e.g., Whitehead v. Montgomery Ward & Co., Inc.*, 194 Or 106, 239 P2d 226 (1952) (release agreement is invalid where there was a great disparity between amount paid to the plaintiff and the damages actually sustained, the defendant misrepresented that the writing was a receipt and not a release, the plaintiff did not have independent legal advice, and the plaintiff could not read agreement because he did not have his glasses); *Peluck v. Pac. Machine & Blacksmith Co.*, 134 Or 171, 178, 293 P 417 (1930) (release agreement should be subject to close scrutiny where the par-ties were not dealing at arm's length, the plaintiff did not have the benefit of independent legal advice, and the plaintiff was in poor mental and physical condition at the time release was signed); *Kim v. Allstate Ins. Co.*, 102 Or App 529, 795 P2d 582, *rev den*, 310 Or 475 (1990) (material issues of fact existed precluding summary judgment as to whether, where the parties were not on equal footing, the plaintiff adduced evidence that she was induced to sign the release on the basis of misrepresentations and material omissions made by the defendant regarding the value and potential success of the plaintiff's legal claim).

Here, in contrast, it is undisputed that plaintiff, not defendant, proposed the Mutual Release and that defendant accepted plaintiff's proposed language without any material revision. It is further undisputed that the parties were highly experienced in complex commercial transactions and that both were represented by experienced counsel. Finally, it is undisputed that—because of the conflict that had arisen con-cerning the original Sales Agreement and the timber cruise results—by the time these parties executed the Mutual Release, they were, in some sense, adversaries. In sum, the concerns about unequal bargaining power and unconsciona-ble overreaching that underlay *Whitehead*, *Peluck*, and *Kim* did not exist in this case. To paraphrase defendant's appel-late counsel: "These were not babes in the woods, and both had their eyes open." *See Lindgren v. Berg*, 307 Or 659, 772 P2d 1336 (1989) (where parties had full access to independ-ent legal advice, and counsel participated in negotiation and

drafting of release, release barred all claims, including claims for fraud in the inducement of the release).[10]

This case is different from *Whitehead, et al.*, in a second, and equally fundamental, respect: In those cases, the defendants' inequitable conduct related directly to the execution of the release itself. But here, defendant's inequitable conduct pertained solely to the negotiation, drafting, and execution of the Amended Sales Agreement, and not to the Mutual Release. We again emphasize that plaintiff, not defendant, proposed the release and that the language of the release was, in all material respects, drafted by plaintiff's counsel. This was not a case in which defendant, in an effort to escape liability for fraud in the inducement, proposed or insisted upon a broad release as a condition of the execution of the substantive agreement.

■ Plaintiff argues, nevertheless, that defendant's inequitable conduct bars enforcement of the Mutual Release because, if defendant had "disclosed that [it] intended to claim a right to the land in Townships 7 and 8, Pioneer would not have signed the Amended Sales Agreement and Release." That "but-for" argument, which the trial court accepted, *see* 187 Or App at 355-56, misses the mark. Under Oregon law, fraud or inequitable conduct with respect to a transaction that is the subject of a release does not bar enforcement of a release, so long as the release was not itself the product of fraud in the inducement. *Ristau v. Wescold, Inc.*, 318 Or 383, 868 P2d 1331 (1994).

In *Ristau*, the plaintiff and the defendant, who were both 50 percent shareholders of a corporation, entered into a stock sale agreement by which the plaintiff conveyed his shares to the defendant. Contemporaneously, and at the

---

[10] In *Lindgren*, the court emphasized the principle of enforcing the parties' freely bargained allocation of risk:

"Certainty and judicial economy are served when parties can negotiate settlement of their disputes with confidence that their settlement agreements will be upheld and enforced by the courts. Parties to a contract, particularly parties who, as here, are represented by lawyers in negotiating and drafting the contract, should be allowed to allocate the actual risks of the contract as they see fit. The likelihood of a misunderstanding between parties is greatly reduced where each party is represented by a lawyer."

307 Or at 665.

plaintiff's suggestion, the parties executed a separate release agreement drafted by the plaintiff's lawyer. That release provided, in part:

> "Effective as of the date hereof, [plaintiff] Ristau and [defendant] Youngren hereby mutually release each other from any and all claims, demands, rights, damages, expenses, loss of compensation, suits and causes of action, whether known or unknown, now existing.

> "The parties do not by this document release each other from any of the following obligations:

> "The obligations of the parties under the following agreements, all of which are effective substantially contemporaneously herewith, and all of the agreements and obligations envisioned under such agreements, including, but not limited to, the following:

> "A. Agreement to Purchase and Sell Western Engineers, Inc. Stock."

*Id.* at 385-86 (internal quotation marks omitted). Several years later, the plaintiff filed an action against the defendant, alleging, *inter alia*, fraud in the inducement of the stock sale agreement and seeking rescission of that agreement. The trial court granted the defendant summary judgment on the ground that the release agreement barred the plaintiff's claim. *Id.* at 386-87.

Ultimately, the Supreme Court affirmed the allowance of summary judgment. In so holding, the court first determined that the release unambiguously barred the plaintiff's claim. *Id.* at 387-88.[11] The court then considered the plaintiff's argument, based on New Jersey authority,[12] that a

---

[11] We distinguish that aspect of *Ristau*'s analysis below in our consideration of the scope of the Mutual Release in this case. 187 Or App at 364.

[12] *Bilotti v. Accurate Forming Corp.*, 39 NJ 184, 188 A2d 24 (1963). In *Ristau*, the court summarized *Bilotti* as follows:

> "The New Jersey Supreme Court held that a fraud claim involving a stock sale transaction executed simultaneously with a release agreement could not be 'expressly embraced in that instrument' or 'within the fair import of the general terms employed' unless 'possible fraud in the stock sale was specifically considered at the time the transaction was consummated and the release delivered.'"

*Ristau*, 318 Or at 389 (quoting *Bilotti*, 39 NJ at 205).

contemporaneously executed release could not bar a claim for fraud in the inducement of the underlying transaction unless the release explicitly encompassed a claim for fraud in the inducement of the substantive transaction:

> "[W]e will enforce an unambiguous release that covers the claim at issue. We decline to hold, however, that even an unambiguous release agreement must include an *explicit* reference to fraud claims arising contemporaneously with the release agreement in order to bar recovery. As this court held in *Glickman v. Weston*, 140 Or 117, 125, 11 P2d 281, 12 P2d 1005 (1932), a general release from all claims and demands is sufficient to bar a specific claim, unless the claim is excepted from the release agreement."

*Ristau*, 318 Or at 389 (emphasis in original).

Thus, in *Ristau*, the court necessarily rejected plaintiff's contention in this case that fraud in the inducement of the underlying transaction renders a contemporaneously executed release agreement unenforceable. Rather, so long as the release agreement was not itself the product of unconscionable overreaching or fraud,[13] the dispositive inquiry is whether the scope of the release is so broad as to unambiguously encompass, and preclude, plaintiff's claims pertaining to the underlying substantive transaction—here, the Amended Sales Agreement.

With that understanding, the dispute as to the release's enforcement narrows to a question of contractual

---

[13] Indeed, in *Lindgren*, the court held that, if a release is sufficiently broad and unambiguous, it can bar claims even for fraud in the inducement of the release itself:

> "We allowed review to consider whether the release plaintiffs signed bars them from litigating whether the release itself was induced by Berg's fraud. We hold that it does.
>
> "* * * * *
>
> "The release plaintiffs signed provides that the parties release each other from any claims they 'ever had or now has or later may have arising out of or in any way related to * * * Hillsboro Mall Joint Ventures * * * [for] fraud, nondisclosure, [or] misrepresentation * * * in any capacity whatsoever.' If that language means anything, it means that the parties acknowledge that there could be claims for fraud, nondisclosure, or misrepresentation of which the parties might be unaware and that any such claims were to be covered by the release."

307 Or at 664-65.

construction: Does the Mutual Release bar a claim for reformation of the Amended Sales Agreement? The release provides:

> "Prior to the date on which an Amended Sales Agreement executed in connection herewith was signed, the parties asserted various claims against each other arising from events that were directly related to this transaction. The parties intend for an Amended Sales Agreement executed in connection herewith to resolve those disputes and to settle all claims of one against the other. Accordingly, each party hereby releases the other from any and all claims and liabilities arising from any event related to this transaction which occurred prior to the time and date of the signing of the Amended Sales Agreement executed in connection herewith. This Mutual Release is not intended to affect the contractual rights and responsibilities of either party as set forth in the Amended Sales Agreement and the Sales Agreement referred to therein."

A release, as a species of contract, is subject to the principles of contract construction and interpretation. *Ristau*, 318 Or at 387. A contract provision is ambiguous if it is capable of more than one sensible and reasonable interpretation. *See Yogman v. Parrott*, 325 Or 358, 361-62, 937 P2d 1019 (1997); *Deerfield Commodities v. Nerco, Inc.*, 72 Or App 305, 317, 696 P2d 1096, *rev den*, 299 Or 314 (1985).

If the terms of the release agreement are unambiguous, "the construction of [the] contract is a question for the court and is treated as a matter of law." *Ristau*, 318 Or at 387 (quoting *May v. Chicago Insurance Co.*, 260 Or 285, 292, 490 P2d 150 (1971)) (internal quotation marks omitted). An unambiguous contract must be enforced according to its terms. *Ristau*, 318 Or at 387 (citing *OSEA v. Rainier School Dist. No. 13*, 311 Or 188, 194, 808 P2d 83 (1991)). We conclude that, when viewed in its totality, the Mutual Release does not bar a claim for reformation of the Amended Sales Agreement.

Defendant's argument to the contrary focuses on the Mutual Release's penultimate sentence:

> "Accordingly, each party releases the other from any and all claims and liabilities arising from any event related to this transaction which occurred prior to the time and date of the

signing of the Amended Sales Agreement executed in connection herewith."

In particular, defendant contends that plaintiff's asserted entitlement to reformation is a "claim"[14] and that, because that claim arises from "event[s] related to [the Amended Sales Agreement] which occurred prior to" the execution of that agreement—*viz.*, Eves's conduct—reformation is unambiguously precluded. Defendant further invokes *Ristau* as being directly analogous and controlling.

Defendant's argument is initially, literally, plausible. However, that argument fails when viewed in the total context of the Mutual Release's complete language and the parties' dealings. *See Glickman v. Weston*, 140 Or 117, 126-27, 11 P2d 281, 12 P2d 1005 (1932) (release agreement "must be construed by its contents as a whole in order to give it the construction the parties intended").

The first sentence of the Mutual Release recites that there were disputes between the parties arising from their previous dealings. The second sentence then states:

"The parties intend for an Amended Sales Agreement executed in connection herewith to resolve those disputes and to settle all claims of one against the other."

That sentence is followed by the operative "release" sentence that defendant emphasizes. Significantly, however, that sentence begins with the term, *"Accordingly."* By plain meaning, that term links the release sentence to the circumstances described in the preceding sentences. *See Webster's Third New Int'l Dictionary* 12 (unabridged ed 1993) (defining "accordingly" as "in conformity with a given set of circumstances," "as a consequence," or "as a logical outcome"). That is, the use of "accordingly" connotes that the release is intended to effectuate the parties' intent to resolve any dispute from their prior dealings and to proceed henceforth on

---

[14] *Black's Law Dictionary* 240 (7th ed 1999) defines "claim" as follows:

"1. The aggregate of operative facts giving rise to a right enforceable by a court * * * 2. The assertion of an existing right; any right to payment *or to an equitable remedy*, even if contingent or provisional * * *."

(Emphasis added.)

the basis of the Amended Sales Agreement. The final sentence of the Mutual Release corroborates that intent:

> "This Mutual Release is not intended to affect the contractual rights and responsibilities of either party as set forth in the Amended Sales Agreement and the Sales Agreement referred to therein."

In sum, when viewed in total context, the Mutual Release expresses the parties' intent to "wipe the slate clean" and to begin, anew, under the Amended Sales Agreement.

Properly so understood, the Mutual Release does not preclude reformation of the Amended Sales Agreement. That is so because of the essential nature of reformation, which (unlike rescission) seeks to confirm, rather than disavow, the parties' true agreement:

> "Reformation contemplates a continuance of the contractual relation upon what both parties really intended should be the stipulation. Rescission, however, proceeds upon the ground that on account of the mistake of one of the parties his mind in very truth did not assent to the contract as written. In other words, there was in fact no meeting of minds, which leads logically to a rescission or ending of the pseudocontractual relation."

*Churchill v. Meade*, 92 Or 626, 634, 182 P 368 (1919).

Thus, plaintiff here, far from seeking damages based on some antecedent dispute (which the Mutual Release bars), instead sought a judicial determination and enforcement of the parties' actual "contractual rights and responsibilities" under the Amended Sales Agreement itself. That is completely consonant with the parties' intent as expressed in the entire release and, most particularly, in the final sentence of the Mutual Release.[15]

---

[15] Conversely, defendant's view that the "any and all claims" language of the third sentence precludes any claim for reformation would frustrate the parties' intent of proceeding anew under the Amended Sales Agreement. Consider, for example, a hypothetical circumstance in which the Amended Sales Agreement erroneously recited that the purchase price for the timber was "$45," and not "$45 million." Under defendant's view, the Mutual Release would preclude plaintiff from seeking reformation of that price term because the scrivener's error was "an event related to this transaction which occurred prior to the time and date of the signing of the Amended Sales Agreement."

We note, finally, that the nature of the relief sought here, when coupled with the particular language of the Mutual Release, materially distinguishes this case from *Ristau*, where the plaintiff sought rescission. It is true, as defendant points out, that there are some similarities between the language of the release in *Ristau* and the language of the Mutual Release here. However, nothing in *Ristau* purported to address the application of a release to a claim for reformation—much less where, as here, the language of the release expressly contemplates future enforcement of the parties' "contractual rights and responsibilities." The Mutual Release does not bar plaintiff's reformation claim.

## II. REFORMATION: THE MERITS

We turn, then, to the sufficiency of plaintiff's proof of entitlement to reformation. To be entitled to reformation, a party must prove, by clear and convincing evidence, the following three elements:

> "(1) that there was an antecedent agreement to which the contract can be reformed; (2) that there was a mutual mistake or a unilateral mistake on the part of the party seeking reformation and inequitable conduct on the part of the other party; and (3) that the party seeking reformation was not guilty of gross negligence."

*Jensen v. Miller*, 280 Or 225, 228-29, 570 P2d 375 (1977) (citations omitted).

### A. *Antecedent Agreement*

We begin with the identification of the "antecedent agreement," if any. That, in turn, implicates a tangle of interlocking and subsidiary issues.

The trial court determined that the antecedent agreement, for purposes of describing the property to be conveyed, was the Sales Agreement. In particular, in its letter opinion of January 20, 1998, the trial court observed:

> "The Term Sheet and the Sales Agreement are essentially the same. The latter provides greater detail about the mechanism by which the parties' agreement would be carried out. However, both contain the same essential terms of

parties, the sale price, the price adjustment procedure and a description of what was to be sold.

"* * * * *

"Because the limited issue here is how much land and timber the parties intended to sell, the last document which accurately set forth the mutual agreement of the parties was the Sales Agreement.

"The Court concludes that clear and convincing evidence establishes that the Sales Agreement was the antecedent agreement which existed between the parties.

"For all practical purposes, whether it is the Term Sheet or the Sales Agreement, the outcome is the same. Those changes which were made from the time of the Term Sheet only refined those essential terms to which both parties had already agreed and further defined through negotiation."

Subsequently, in its "Interlocutory Order Reforming Amended Sales Agreement," the court incorporated by reference the findings and conclusions of its letter opinion and stated that "[t]he Sales Agreement is the antecedent agreement," while, at the same time, directing that the Amended Sales Agreement be reformed to exclude the property in Townships 7 and 8. The court's final judgment, which did not explicitly identify any specific "antecedent agreement," similarly, and simply, directed that the Amended Sales Agreement be reformed to exclude the property in Townships 7 and 8.

Defendant first asserts that the trial court's identification of the Sales Agreement as the antecedent agreement cannot be squared with the relief it granted—and, indeed, that the two are irreconcilable. We agree.

The Sales Agreement includes the following description of the property to be conveyed:

"Johnson and Pioneer have agreed that Johnson shall purchase from Pioneer and Pioneer shall sell to Johnson the Rudio Mt. Tract upon the terms and conditions set forth in this Agreement.

"* * * * *

> "For purposes of this Agreement, the Rudio Mt. Tract shall include all properties of the Kinzua Corporation and Kinzua Owners which are located in Wheeler County south of the John Day River, together with *all properties of the Kinzua Corporation and the Kinzua Owners which are located in Grant County, Oregon.* Such property shall include, *without limitation,* property located in Townships 10, 11, and 12 South in Grant County and in Wheeler County, Oregon."

(Emphasis added.) Thus, the property description of the Sales Agreement unambiguously encompasses all Kinzua property in Grant County—which, necessarily, included the property in Townships 7 and 8. If the Sales Agreement were reformed to include that property description, defendant would be entitled to retain the disputed property.

That does not, however, end the matter. On *de novo* review, we are permitted—indeed, obligated—to determine within the fair scope of the parties' proof whether there is some other, alternative antecedent agreement as to the property to be conveyed that would yield the relief that plaintiff seeks and the trial court granted. There is, at least arguably, such an agreement. The Term Sheet, which memorialized the parties' original discussion and understanding as to the property to be conveyed, included the following description:

> "D. R. Johnson * * * will purchase and Pioneer * * * will sell all surface and subsurface rights of the *current Kinzua holdings in [T]ownships 10, 11 and 12 South located in Grant County* and Wheeler County, Oregon, consisting of approximately 40,000 acres, commonly referred to as the Rudio Mountain tract (the Timberland) * * *."

(Emphasis added.) *That* description unambiguously does not include any property in Townships 7 and 8. Consequently, reformation of the Amended Sales Agreement to include that description would yield the relief the trial court allowed.[16]

---

[16] In sum, contrary to the trial court's understanding, the Term Sheet and the Sales Agreement are not "essentially the same." Depending on which is employed as the operative antecedent agreement, the outcome is dramatically different.

Thus, if plaintiff is to prevail on appeal, it can do so only by establishing that it is entitled to reformation by reference to the Term Sheet's property description as the antecedent agreement. That, in turn, requires plaintiff to make a *two-step* showing. *First,* plaintiff must show—as the trial court found—that the property description in the Amended Sales Agreement is not enforceable because it was the product of plaintiff's unilateral mistake coupled with defendant's inequitable conduct, and that plaintiff was not grossly negligent in agreeing to that description. *Second,* because the Term Sheet antedated the original Sales Agreement, in order to employ the Term Sheet's description as the antecedent agreement, plaintiff must also show that the property description in the Sales Agreement is not binding as the antecedent agreement because *that* description was itself the product of either mutual mistake or plaintiff's unilateral mistake coupled with defendant's inequitable conduct and that plaintiff was not grossly negligent with regard to *that* agreement. In other words, in order to reach and rely on the Term Sheet's property description as the true antecedent agreement, plaintiff must effectively "pierce" the property description of the intervening Sales Agreement.

■ Before considering the sufficiency of plaintiff's proof pertaining to the other elements of reformation with respect to each of those two steps, we must address two other threshold objections that defendant raises to relying on the Term Sheet's property description as the operative antecedent agreement. Defendant first asserts that the Term Sheet cannot be the antecedent agreement because it was not itself legally enforceable. In particular, defendant argues that the Term Sheet cannot be the antecedent agreement between the parties because it was unsigned. *See* ORS 41.580(1)(e) (Statute of Frauds requires that an agreement for the sale of land, in order to be enforceable, must be in writing and signed by the party to be charged).

■ Defendant is incorrect. Although reformation requires sufficient proof of an antecedent agreement, there "*need not be a binding agreement* prior to the writing of which reformation is sought * * *." *DeTweede v. Barnett Estate,* 160 Or 406, 411, 85 P2d 361 (1939) (emphasis added); *see also Restatement (Second) of Contracts* § 155 comment a (1981) (a

party seeking reformation must prove the existence of an agreement predating the writing, but the "prior agreement need not * * * be complete and certain enough to be a contract"). In many reformation cases, the antecedent agreement is a oral agreement. *See, e.g., Jensen,* 280 Or at 227, 230; *Edwards Farms v. Smith Canning Co.,* 197 Or 57, 62, 251 P2d 133 (1952); *DeTweede,* 160 Or at 411.

We further reject defendant's implication that the fact that the parties did not sign the Term Sheet indicates that the parties—or, at least, defendant—did not assent to its terms. The parties' decision not to sign the Term Sheet—and, instead, to proceed immediately to the drafting and execution of a more formal agreement—was simply the product of the Term Sheet's own requirement that the parties enter into a binding sales agreement to replace the Term Sheet within five days.[17] Thus, we conclude, as did the trial court, that the principals of both parties agreed to the terms in the Term Sheet and that those terms reflected what was, at that time, the parties' shared understanding and intent that plaintiff was to sell, and defendant was to buy, Grant County land and timber located only in Townships 10, 11, and 12.[18]

Defendant further argues that, even if the Term Sheet could be deemed an antecedent agreement, the court, in granting reformation, would be required to reform to that agreement *in toto.* That is, the court cannot simply reform the property description of the Amended Sales Agreement to conform to the Term Sheet's property description; rather, the "reformed" Amended Sales Agreement would have to include *all* of the terms of the antecedent agreement, including price, warranties, etc. In short, in defendant's view, reformation must be an "all-or-nothing" proposition. In that regard,

---

[17] That understanding is corroborated by the February 28 fax that Eves sent to plaintiff. In that fax, Eves stated that the parties "had a one page agreement to be signed first, with a more comprehensive agreement to follow[,]" but that they had, at plaintiff's request, "gotten directly into the comprehensive agreement."

[18] The trial court made at least two specific determinations with respect to that issue. First, the trial court rejected as not credible Johnson's testimony that he did not know of, or assent to, the conditions in the Term Sheet. Second, as noted earlier, the trial court concluded that the "one page agreement" to which Eves referred in his February 28 fax to Gildea was the Term Sheet and not, as Eves testified, some other generic document. We give substantial weight to the trial court's resolution of those credibility determinations. *Foster,* 177 Or App at 48 n 1.

defendant emphasizes that many of the essential terms of the Amended Sales Agreement, including price, differed materially from the parties' prior agreement. Defendant further asserts that, given those differences, to modify/reform one term (the property description) of the ultimate agreement, without concomitantly incorporating and enforcing the other terms of the antecedent agreement, would yield inequitable results.

Defendant's "all-or-nothing" argument *may* have some merit in other circumstances. However, on the facts presented here, we reject it as unpersuasive. Two hypothetical cases—one simple, the other more complex—illustrate our reasoning.

**Case #1:** A orally offers to buy B's house for $100,000, and B orally agrees. The parties do not, however, discuss other material terms, including payment terms, and they agree that A will prepare a complete written contract. A then sends B a "sales agreement" that provides that B will sell A "the property described in the attached title report" for $100,000. Unbeknownst to both A and B, the property described in the title report encompasses not only B's house but also B's gold mine on an adjacent parcel. B signs the contract without reviewing the title report. Later, B seeks to reform the contract's property description based on mutual mistake.

**Case #2:** The facts are, initially, the same as those in Case #1, except that the written contract that A sends to B also provides that the sale is contingent upon a satisfactory home inspection. Again, as in Case #1, B signs the contract without reviewing the title report, which encompasses B's gold mine. Again, A is also ignorant of the title report's description.

Thereafter, the home inspection is unsatisfactory, and A tells B that the deal is off. B responds by offering to sell the property "as is" for a reduced price of $75,000. A then discovers that the title report includes not only B's house but also B's gold mine. Without informing B of that fact, and knowing that B is ignorant of that fact, A agrees to B's proposal, and the parties enter into an "amended sales agreement" by which B agrees to sell the "property described in the attached title report" "as is" for $75,000. Thereafter, A begins extracting ore from the gold mine. B then seeks to

reform the property description in the amended sales agreement to conform to the description in the parties' original oral agreement, *i.e.*, "B's house."

Assume, for present purposes, that the facts of Case #1 establish mutual mistake without gross negligence by B, the seller, and that the facts of Case #2 establish unilateral mistake by B, coupled with inequitable conduct by A, and no gross negligence by B. That is, assume that the facts of the two hypothetical cases establish all other essential elements of reformation.[19] The question remains: Can a single term—the property description ("B's house") in the original, nonenforceable oral agreement—constitute the "antecedent agreement" for purposes of reforming the parties' sales agreement and, ultimately, their amended sales agreement?

█ We have found no reported Oregon decision that gives direct guidance. Nevertheless, in appropriate circumstances, reference to a single term as the operative "antecedent agreement" comports with, and promotes, the equitable function of reformation:

> "The province of reformation is to make a writing express the agreement that the parties intended it should. * * * [R]eformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing. Their mistake is one as to expression—one that relates to the content or effect of the writing that is intended to express their agreement—and the appropriate remedy is reformation of that writing properly to reflect their agreement."

*Restatement* at § 155 comment a. *See also Churchill*, 92 Or at 634 ("Reformation contemplates a continuance of the contractual relationship upon what both parties really intend should be the stipulation.").

Applying those principles to the first hypothetical case, equity is fully served by employing the property description of the parties' oral agreement as the antecedent agreement for purposes of reforming their original sales agreement. At the time they executed that written agreement, both A and B believed that A was acquiring only B's house. Reformation of only the single term, the property description, effectuates their true intent.

---

[19] We address at length below whether plaintiff proved those elements in this case.

The second hypothetical case is more difficult both because (as in this case) other material terms of the parties' ostensible bargain—price and warranty—had changed between the original sales agreement and the amended sales agreement and because (by analogy to defendant here) by the time the parties executed the amended sales agreement, A knew that the title report's description included the gold mine, and B still did not. Thus, A could argue—as defendant here implicitly does—that reformation of the single term would not serve to effectuate the parties' "true intent" because A would never have entered into the amended sales agreement, even at the reduced price, but for the fact that the property description included the gold mine. That reasoning, in turn, *might* support rescission—a result neither of the present parties seeks. Instead, as noted, defendant here asserts that, if plaintiff otherwise establishes an entitlement to reformation, the Amended Sales Agreement must be "reformed" by effectively "defaulting" to the original Sales Agreement *in toto*.[20]

We reject defendant's "wholesale reformation" approach. In the circumstances of this case, such an approach would yield the antithesis of reformation. Rather than modifying the Amended Sales Agreement so as to effectuate the parties' true agreement, such "reformation" would revive the original Sales Agreement that, whatever their other disagreements, the parties clearly intended to supersede.

We thus conclude that the Term Sheet's property description is a legally cognizable antecedent agreement and that, if plaintiff establishes the other requisites of reformation, the property description of the parties' Amended Sales Agreement is properly reformed by reference to that antecedent agreement. We turn, then, to the sufficiency of plaintiff's proof of those other elements. For logical and chronological clarity, we first address the original Sales Agreement and then the Amended Sales Agreement.

---

[20] Thus, in defendant's view, the prior agreement in its entirety is the "antecedent agreement." Instead of modifying and substituting a single term (the property description), "reformation" can be achieved only by substituting the prior agreement *in toto* for the Amended Sales Agreement. *See* 187 Or App at 368.

B. *The Original Sales Agreement: Mutual Mistake Without Gross Negligence*

As described above, 187 Or App at 365-66, the property description of the original Sales Agreement unambiguously encompassed the property in Townships 7 and 8. Nevertheless, we determine that that description was not the enforceable antecedent agreement here because that description was itself the product of mutual mistake and plaintiff was not grossly negligent in executing the Sales Agreement.

With respect to mutual mistake we find, particularly, that, when they executed the Sales Agreement on March 3, 1994, both plaintiff and defendant believed that "all properties of the Kinzua Corporation and the Kinzua owners which are located in Grant County, Oregon" was limited to property in Townships 10, 11, and 12. Indeed, as described more fully below, defendant did not learn otherwise until more than a month later, on or about April 8. *See* 187 Or App at 375. That understanding as of March 3 was fully consonant with the parties' oral discussions and negotiations, as memorialized in the Term Sheet. *See* 187 Or App at 345-46. It also comports with Gildea's recounting of Eves's explanation for the change of language in the Sales Agreement, *see* 187 Or App at 346 n 4—an account that the trial court found credible. Finally, Demers's testimony that he mistakenly believed that plaintiff was not acquiring any Kinzua land in Grant County north of the John Day River and Melvin McDougal's testimony as to his contemporaneous misreading of the map of Kinzua holdings persuasively substantiate mutual mistake.

Gross negligence—or, rather, plaintiff's asserted lack of gross negligence—requires more extended treatment. Defendant emphasizes that plaintiff bears the burden of proving the *lack* of gross negligence. *See, e.g., Murray v. Laugsand*, 179 Or App 291, 303, 39 P3d 241 (2002); *Foster*, 177 Or App at 53. Defendant contends, particularly, that, given the failure of plaintiff's principals and agents to review the contractual property description and check it against other available documentation, plaintiff cannot meet that burden.

In *Foster*, we addressed the contours of "gross negligence" in this context:

> "The term 'gross negligence,' at least as it is used in the reformation context, is not well defined in the case law. Certainly, not all inattentive conduct by a party seeking reformation will bar equitable relief. Rather, conduct, in order to bar reformation, must go beyond mere oversight, inadvertence, or mistake and, instead, must amount to a degree of inattention that is inexcusable under the circumstances. The inquiry is necessarily fact-specific * * *. In other words, 'gross negligence,' far from being a static concept subject to mechanical application, is one that requires careful consideration of the facts to determine if the party seeking reformation is, both in light of his or her own actions and as a matter of equity, entitled to such relief."

177 Or App at 54 (citations omitted).[21] *See also Mariah Investments, Ltd. v. McCabe*, 163 Or App 91, 986 P2d 1209 (1999) (*aff'd by an equally divided court*) (Wollheim, J., concurring), *rev den*, 329 Or 651 (2000) (describing the gross negligence inquiry in the context of a rescission claim).

■■ ■■ Although, as a general rule, "one who assents to a writing is presumed to know its contents and cannot escape being bound by its terms merely by contending that he did not read them[,]" an exception exists where reformation is an available remedy. *Restatement* at § 157 comment b. Reformation is available, in turn, only where there exists an agreement that preceded the writing. In such a case, "a party's negligence in failing to read the writing does not preclude reformation if the writing does not correctly express the prior agreement." *Id.*; *see also Murray*, 179 Or App at 307 ("[A] party's failure to read a document, by itself, will generally not constitute gross negligence sufficient to bar reformation.").

The question, then, is whether a party's failure to detect the objectionable material in a particular case

---

[21] Although Oregon continues to employ the term "gross negligence," the *Restatement* disapproves:

> "Although the critical degree of fault is sometimes described as 'gross' negligence, that term is not well defined and is avoided in this Section, as it is in the *Restatement (Second) of Torts*. Instead the rule is stated in terms of good faith and fair dealing."

*Restatement* at § 157 comment a.

"amount[s] to a degree of inattention that is *inexcusable under the circumstances*," *Foster*, 177 Or App at 54 (emphasis added), where such circumstances include the existence of previous agreements between the parties relating to the same transaction. The significance of the existence of an antecedent agreement is closely connected to the concept of reliance. When two parties have an agreement that antedates their written agreement but relates to the same basic transaction, that previous agreement and the shared understandings with respect to that agreement help shape the parties' expectations as to the later written agreement. As a result, oversight in failing to read documents that might correct a party's mistaken understanding of some aspect of the transaction may, rather than constituting gross negligence precluding reformation, be excusable neglect, arising from the party's reliance on the terms as expressed in the previous agreement between the parties.

■ Applying those principles here, plaintiff's failure to accurately confirm the Kinzua properties to be acquired against the Sales Agreement's property description did not rise to the level of gross negligence. As of March 3, 1994, all the principals to the transaction understood that it involved only property in the immediate vicinity of Rudio Mountain. No one believed that it encompassed timberland miles away. Defendant's representative, Eves, himself believed that the revision of the Sales Agreement's property description modifying the Term Sheet's description was necessary only to ensure that defendant did, in fact, acquire all of the scattered "satellite parcels" in the immediate vicinity of Rudio Mountain. *See* 187 Or App at 346 n 4. Given the totality of those circumstances, plaintiff's failure to review available documents more carefully did not rise to the level of gross negligence.[22]

We thus conclude, at the "first step" of our two-step analysis, that the property description of the Sales Agreement was the product of mutual mistake without gross negligence and, thus, is not a binding antecedent agreement.

---

[22] Indeed, a contrary conclusion would mean that, if the parties' dealings had ended with the original Sales Agreement, defendant would have been entitled to retain the property in Townships 7 and 8 against any claim of reformation—notwithstanding that, at that point, defendant had never intended to acquire that property. That result, conferring a windfall, would be the equivalent of allowing A to retain B's gold mine in the first hypothetical case above. *See* 187 Or App at 369.

C. *The Amended Sales Agreement: Unilateral Mistake Coupled With Inequitable Conduct, Without Gross Negligence*

When the parties executed the Amended Sales Agreement on April 15, defendant knew that the property description that Eves had drafted and altered included the land in Townships 7 and 8. Indeed, defendant had been aware from at least April 8—when Bryan reviewed the preliminary title reports for the Kinzua-Pioneer transaction and discovered the description of the properties in Townships 7 and 8—that, contrary to the parties' mutual understanding up to that point, the property description in the original Sales Agreement actually encompassed the now-disputed properties north of the John Day River in Grant County. *See* 187 Or App at 349.

Plaintiff remained ignorant of that fact throughout. Consequently, when plaintiff executed the Amended Sales Agreement, it did not intend to convey the now-disputed property.

Plaintiff has, thus, proved unilateral mistake. But unilateral mistake alone cannot justify reformation. Rather, plaintiff must also prove "inequitable conduct" by defendant and, again, that plaintiff was not itself "guilty of gross negligence in making the mistake." *Gardner v. Meiling,* 280 Or 665, 675, 572 P2d 1012 (1977).

Our assessment of "inequitable conduct" necessarily focuses on defendant's actions—and certain inactions—in the totality of the circumstances between April 8 and April 15. That inquiry is, frankly, somewhat impressionistic. As with "gross negligence," there is no omnibus standard by which we can definitively determine whether a contracting party's behavior constitutes "inequitable conduct." Rather, "the range of misconduct termed 'inequitable' is quite broad, varying from the most egregious and concrete, such as fraud, to more amorphous and somewhat less egregious misconduct, sometimes described as 'overreaching' or 'sharp practice.'" *Murray,* 179 Or App at 302.

Still, a few general principles afford some guidance. First, a party's explicit or implicit misrepresentation about a

material term of a written agreement can constitute inequitable conduct. *See Restatement* at § 166 (if one party's "fraudulent misrepresentation as to the contents or effect of a writing evidencing or embodying in whole or in part an agreement" induces the other party's assent to that agreement, the court "may reform the writing to express the terms of the agreement as asserted"). That principle encompasses not only express misrepresentations but also circumstances in which one party knows that the other party is materially mistaken as to a writing's scope and effect, but remains silent, hoping to take advantage of the other's mistake. *Id.* at comment a (the misrepresentation principle applies where "only one party is mistaken and the other, although aware of the mistake, says nothing to correct it. In that case his nondisclosure is equivalent to an assertion that the writing is as the other understands it to be.").

Comment e to section 161 of the *Restatement* expresses a closely related principle:

> "One party cannot hold the other to a writing if he knew that the other was mistaken as to its contents or as to its legal effect. He is expected to correct such mistakes of the other party and his failure to do so is equivalent to a misrepresentation, which may be grounds * * * for reformation * * *."

*See also* George E. Palmer, III, *The Law of Restitution* § 13.5, 24 (1978) ("If the parties have reached an agreement which they intend to express in a writing, but through an error unknown to one of them the writing does not correctly express the agreement, reformation will be granted if the other party knows of the error when the writing is signed.").

Oregon courts have consistently applied those principles in granting reformation. *Webb v. Culver*, 265 Or 467, 509 P2d 1173 (1973), is exemplary. There, the defendant had developed a lot at the western end of a parcel he owned. He fenced the lot but, in doing so, knowingly encroached four feet, three inches, onto the next lot (to the east), which he also owned. *Id.* at 469. The defendant subsequently sold the developed lot to the plaintiffs but did not tell them that the

fence encroached onto the adjacent property, which he continued to own. The property description in the land sales contract was accurate and, if the plaintiffs had measured the lot based on that description, they would have discovered that the lot did not extend to the eastern fence. *Id.* at 471.

Several years later, the defendant demanded that the plaintiffs remove the eastern fence because it was on his property. The plaintiffs sought to reform the property description of the land sales contract to extend their eastern boundary four feet, three inches. The trial court granted reformation, and the Supreme Court affirmed. *Id.* at 470, 472.

In so holding, the Supreme Court emphasized that, although the defendant had never made an explicit misrepresentation, he had implicitly misled the plaintiffs and had failed to disabuse them of their mistake:

> "A contract or deed may be reformed where there has been a mistake by one party accompanied by fraud or other inequitable conduct of the other party. In the present case the evidence clearly establishes that plaintiffs mistakenly believed the fence in question marked the eastern boundary of their land. They were not made aware of the boundary as described in the contract until almost five years after the contract was executed, when [defendant] called upon them to remove the fence.
>
> "Plaintiffs were misled by [defendant's] conduct in constructing the fence, and in developing other parts of the property in such a way as to make it appear that the fence marked the true line. This conduct can be looked upon as an implied representation by [defendant] that he was selling all of the land encompassed by the fence. It would be inequitable to permit him now to assert that the boundary described in the contract was controlling.
>
> "* * * * *
>
> "In the present case plaintiffs could have determined that the fence did not mark the true line, if they had measured on the ground the distances recited in the contract description. But their failure to take this step does not bar their suit for reformation."

*Id.* at 470-71 (footnotes omitted).

*Ray v. Ricketts*, 235 Or 243, 383 P2d 52 (1963), is also instructive. There, as part of the defendants' sale of their lumber business to the plaintiff, the defendants endorsed over to the plaintiff promissory notes that the corporation had issued to them as consideration for loans that they had made to the corporation. The endorsements were unqualified. Later, the plaintiff sued the defendants for payment on the note, arguing that, because the corporation (now his corporation) had not paid the notes on demand, the defendants were liable as endorsers. *Id.* at 246-47. In response, the defendants argued that the endorsement should be reformed to read "without recourse." *Id.* at 244. In particular, the defendants argued that the endorsement of the note was merely a tax and accounting device for the most advantageous treatment of corporate debt and that none of the parties ever intended—as the plaintiff well knew—that the defendants would be personally liable by reason of their endorsement. *Id.* at 247.

The trial court granted reformation, concluding that the insertion of the "without recourse" qualification effectuated the parties' true agreement. The court concluded that, to hold otherwise would give the plaintiff the benefit of a bargain that he knew the parties never intended. *Id.* at 249.

The Supreme Court affirmed. In doing so, the court noted that, even if the case was one of unilateral mistake—*i.e.*, even if the plaintiff had believed that he might someday be able to enforce the note against the defendants—the defendants would still be entitled to reformation under the principles expressed in section 505 of the *Restatement of Contracts* (1932), which paralleled comment e of the *Restatement (Second)* section 161. Section 505 provided:

> " 'Except as stated in §§ 506, 509-511, if one party at the time of the execution of a written instrument knows not only that the writing does not accurately express the intention of the other party as to the terms to be embodied therein, but knows what that intention is, the latter can have the writing reformed so that it will express that intention.' "

*Ray*, 235 Or at 250.[23]

Applying those principles, we determine that, between April 8 and 15, defendant engaged in inequitable conduct that perpetuated, and sought to take advantage of, plaintiff's unilateral mistake. Defendant's behavior over that period must be viewed not only in the broad context of the parties' history but, particularly, against the immediate backdrop of defendant's representations to plaintiff on March 30. As described previously, on March 30, Eves wrote to Gildea enclosing what Eves represented to be a listing of *"all* of the properties to be conveyed as a part of Rudio Mountain" as well as a copy of "a map which describes *all* of the properties included in the Rudio Mountain purchase except one 320 acre parcel which is located outside the boundaries of the map." (Emphasis added.) The listing of the properties did not include any property in Townships 7 and 8, and the map showed land only in Townships 10, 11, and 12.

On April 8, Bryan discovered the description of the properties in Townships 7 and 8 in the preliminary title report. He immediately told Eves that "this was not right" because the parties had never understood that those properties were part of the transaction, as evidenced by the fact that the documents that Eves had sent to plaintiff did not include those properties. Thus, Bryan's discovery informed Eves that defendant's prior affirmative representations as to the scope of the transaction were, in fact, inaccurate. Later, Bryan voiced a prophetic concern that it would look as if defendant was "trying to slip something by."

Eves, however, dismissed Bryan's concerns and determined to keep plaintiff in the dark. Although, like the

---

[23] *Restatement of Contracts* section 505 has been favorably cited in support of the allowance of reformation in other cases as well. *See, e.g., Harris Pine Mills v. Davidson*, 248 Or 528, 536, 435 P2d 310 (1968) (citing section 505 in support of its conclusion that if the defendant knew that the plaintiff intended to retain a right of re-entry under the parties' agreement, and that the deed failed to accurately express that intention, then the plaintiff would be entitled to reformation); *Praggastis v. Sandner*, 40 Or App 477, 484, 595 P2d 520, *rev den*, 287 Or 301 (1979) (citing section 505 in support of its holding that the plaintiff was entitled to reformation of a deed, as the deed did not accurately express the plaintiff's intention to exclude a 44-acre tract and the defendant was aware of that fact when the agreement was signed).

trial court, we regard Eves's testimony as generally self-serving and not credible, we note that Eves testified that he decided not to inform plaintiff about Townships 7 and 8 because, soon after defendant's discovery of the mistake on April 8, he had received a letter from Gildea rejecting the cruise. According to Eves, he regarded the letter as a repudiation of the contract and, thus, felt "there was little point in bringing the subject up." Eves further stated that, "if the contract had not been repudiated, if they had lived up to the terms of it, I'm certain we would have told them." That testimony presents no justification for defendant's failure to correct the misrepresentations in Eves's March 30 cover letter and the enclosed map and listing of properties after the parties resumed negotiations on April 13.

Neither Eves nor any of defendant's other principals and agents ever disabused plaintiff of its mistake. Instead, defendant actively perpetuated that mistake. For example, on April 13, Gildea proposed various settlement alternatives, including one by which plaintiff would sell defendant both the Rudio Mountain property and "Tract III" for $100 million. Although portions of the property in Townships 7 and 8 lay within the boundaries of Tract III, defendant never told plaintiff that some land in Tract III was putatively conveyed under the Sales Agreement. Moreover, Eves did not object when Gildea later informed him that plaintiff was, in fact, selling Tract III to a third party. If, as one might reasonably expect, defendant had expressed such an objection, plaintiff would, of course, have been alerted to its mistake.

Finally, and most egregiously, defendant, through its attorney Eves, engaged in last-minute manipulations of the language of the Amended Sales Agreement that (1) rewrote the description of the land so that the qualifying phrase "south of the John Day River" explicitly referred only to the Wheeler County property; (2) removed the phrase describing the property as composed of "approximately 40,000 acres"; and (3) changed the language to explicitly incorporate the attached preliminary title reports, which included the property in Townships 7 and 8. Those changes were calculated to ensure that defendant would receive ownership of the land and timber in Townships 7 and 8.

"Manipulation" is, in fact, a benign description of Eves's conduct. As noted, 187 Or App at 350-52, after inserting the additional language on the first page of the final draft, Eves altered the margins so that Gildea would not suspect that alteration—and then, contrary to the parties' well-established practice of identifying all changes in the draft, noted the changes on other pages but said nothing about the extensive, material changes on the first page. That course of manipulation, distortion, and concealment is quintessential inequitable conduct.[24]

In sum, from the first tentative negotiations up to April 8, 1994, both parties understood that the transaction involved only property in the immediate vicinity of Rudio Mountain and, particularly, in Grant County south of the John Day River. Beginning on April 8, defendant knew, from its review of the title reports, that the property description of the parties' agreement was broad enough to encompass land and timber not within the parties' original and continuing contemplation. Defendant also knew that, through Eves's transmission of the property list and accompanying map on March 30, it had affirmatively (albeit at that time, innocently) misrepresented the scope of the transaction. Finally, defendant knew that plaintiff continued to operate under the parties' original understanding. Nevertheless, defendant made no effort to correct either its previous misrepresentation or plaintiff's continuing misapprehension. Instead, defendant perpetuated plaintiff's unilateral mistake through purposeful nondisclosure and then sought to benefit from that mistake through subterfuge and overreaching. Defendant engaged in inequitable conduct.[25]

---

[24] The irony, of course, is that all of Eves's surreptitious, too-clever-by-half efforts were ultimately immaterial. If Eves had simply adhered to the property description of the original Sales Agreement, the scope of the transaction, as described in the contract's language, would still have included the property in Townships 7 and 8. *See* 187 Or App at 365-66. Nevertheless, Eves's conduct was highly probative of defendant's belief that it was, in Bryan's phrase, "trying to slip something by."

[25] *Walcutt*, which defendant invokes, is distinguishable. There, the plaintiff personal representative sought to enforce a promissory note by which the defendants were obligated to the decedent. The defendants asserted that a prior general release between the personal representative and the defendants barred that claim. The personal representative replied that the release should be reformed on the basis of "unilateral mistake" because, at the time he executed the release, he was

■ Finally, we turn—again—to gross negligence. In particular, did plaintiff prove, by clear and convincing evidence, that its conduct between the execution of the original Sales Agreement on March 3 and its execution of the Amended Sales Agreement on April 15 was not so negligent as to preclude reformation, notwithstanding plaintiff's unilateral mistake and defendant's inequitable conduct?

We begin by reiterating that, in this context, "gross negligence" is innately circumstantial and elastic. In particular, plaintiff's conduct cannot be assessed and characterized without reference to defendant's. For example, the fact that one party engaged in a course of conduct calculated to conceal and perpetuate the other's mistake necessarily informs our determination of whether the second party's failure to discover its mistake was grossly negligent—or even negligent at all.[26]

Defendant highlights two aspects of plaintiff's conduct as evincing gross negligence: (1) plaintiff's failure to review the property description in the preliminary title reports incorporated by reference into the Amended Sales Agreement and to compare those descriptions with the

unaware of the note's existence and that the defendants' counsel was aware of the note but did not inform the personal representative. 109 Or App at 150-51. The trial court denied reformation, and we affirmed, holding that the defendants' counsel's nondisclosure of the note's existence was not "inequitable conduct" because that information was "readily available" to the personal representative. *Id.* at 152.

*Walcutt* is materially distinguishable in at least three respects. First, it involved a release agreement, and we emphasized the overarching principle that releases and settlements "are favored by the law." *Id.* at 151 (quoting *Davis v. Bacon*, 280 Or 561, 564, 571 P2d 912 (1977)). Second, and more significantly, the parties in *Walcutt* had no history of a continuing mutual understanding as to the scope of their transaction. Thus, *Walcutt* did not involve one party's attempt to take advantage of the other party's mistake grounded in the parties' prior course of dealing. That distinction differentiates *Walcutt* not only from this case, but also from *Webb*, *Ray*, *Harris Pine Mills*, and *Praggastis*, none of which *Walcutt* discussed. Third, there is no suggestion in *Walcutt* that, as here, either the defendants or their counsel made affirmative misrepresentations about the scope of the parties' transaction and then failed to correct those misrepresentations when they discovered that they were untrue.

[26] The trial court here suggested, in *dictum*, that inequitable conduct of sufficient magnitude could excuse even gross negligence—that is, that, in some cases, reformation could be available even if the party seeking reformation had been grossly negligent. We are unaware of any persuasive authority for that proposition, which cannot be squared with the test for reformation summarized in *Jensen*, 280 Or at 228-29, and adhered to in all subsequent cases.

Kinzua map; and (2) plaintiff's failure to review the property description of the final version of the Amended Sales Agreement, as "revised" by Eves. We consider each in turn.

As noted, the genesis of plaintiff's failure to review and compare the title reports, the maps, and the property description of the Amended Sales Agreement lay in Demers's misunderstanding of plaintiff's acquisitions from Kinzua and Melvin McDougal's misreading of the map, when Eves first proposed the property description that was included in the original Sales Agreement. 187 Or App at 347. Thereafter, through Eves's March 30 transmittal of the property list and the accompanying map, defendant reinforced the still-shared belief that the transaction implicated only property in the immediate vicinity of Rudio Mountain. As noted, the list did not include the properties in Townships 7 and 8, and the map showed property in Townships 10, 11, and 12 only. *See* 187 Or App at 348, 378-79. Given that history, plaintiff apparently, ultimately "assumed," without confirming, the content of the title reports.

That assumption—that default—was, no doubt, careless. Sound commercial practice requires review of material underlying documents. Those documents were readily accessible, and review would not have been unreasonably onerous. Nevertheless, we conclude that plaintiff's default was not of such a quality and degree—"gross negligence"—as to preclude reformation, given plaintiff's unilateral mistake and defendant's manifest inequitable conduct.

We so conclude for three related reasons. First, as noted, a party's failure to review a contract or related documents generally does not, by itself, constitute preclusive "gross negligence" where the writing materially deviates from the parties' antecedent mutual understanding. *Compare Murray*, 179 Or App at 307, *and Foster*, 177 Or App at 55, *with Main v. Howard*, 52 Or App 797, 804, 629 P2d 870 (1981). *See also Restatement (Second) of Contracts* § 157 comment b (1981) (in cases in which there was "an agreement that preceeded the writing," "a party's negligence in failing to read the writing does not preclude reformation if the writing does not correctly express the prior agreement").

Here, the parties' baseline mutual understanding was always—or, at least, until April 8—that plaintiff was selling, and defendant was buying, only property in the immediate vicinity of Rudio Mountain. Neither defendant nor any extrinsic circumstance ever alerted plaintiff that that understanding was inaccurate or had changed. Given those circumstances, plaintiff's reliance on the parties' history of negotiation and agreement was not so inexcusable as to bar reformation.

Second, plaintiff's continuing misapprehension was the product not only of its own default but also of defendant's actions. For example, defendant's March 30 transmittal of the map and list of properties, both of which excluded any property in Townships 7 and 8, corroborated plaintiff's understanding of the scope of the parties' transaction. *See Webb*, 265 Or at 471 (holding that the plaintiffs' reliance on the defendant's implied representation that the fence marked the boundary line of the property, and their resulting failure to measure the distances on the ground as recited in the contract description, was not gross negligence).

Third, the determination of "gross negligence" is ultimately grounded in the equitable principles underlying reformation. So understood, "gross negligence" in this context connotes the result of a balancing of equities: Was one party's "mistake" so inexcusable that it should be bound to a contract procured, in part, through the other party's misleading or overreaching conduct? Here, plaintiff's failure to review the pertinent documents, while careless, was the product of plaintiff's belief that the parties' agreement—at least as to what properties were involved—continued to be what both parties had always understood it to be. Conversely, defendant, in calculated fashion, took advantage of that belief—which it had once shared and which it had perpetuated through its own representations. Given the totality of the circumstances, in equity, plaintiff's default in failing to check the title reports and maps should not, and does not, preclude reformation.

Defendant argues, nevertheless, that *Murray* and *Foster* compel a different result. We disagree. In *Murray*, the plaintiffs sought reformation of a deed to remove a revision,

inserted by the defendants' attorney, that affected the plaintiffs' timber rights on a 20-acre parcel. 179 Or App at 298. We reversed the trial court's grant of reformation based on our conclusion that the plaintiffs had been grossly negligent. *Id.* at 306-07. Our finding of gross negligence was based, in turn, on the plaintiffs' attorney's failure, even after the defendants' attorney made clear his intention to include the revision, to do anything other than object:

> "[A]lthough the deed was an important part of the transaction from plaintiffs' perspective, their attorney did not insist on receiving and reviewing a copy of its final form. Nor did he attend the closing or caution [his client] to carefully inspect the deed—a two-page document—at the closing before it was recorded. An inspection especially was counseled here, where defendants' attorney previously had advised plaintiffs' attorney that the revision was being made and—despite the objection from plaintiffs' attorney— had not agreed to revert to the original form. * * *

> "* * * In short, all information necessary to avoid the mistake was readily available to plaintiffs at closing with no need for an independent investigation."

*Id.* at 306.

Defendant posits that, just as "all information necessary to avoid the mistake was readily available" to the plaintiffs in *Murray*, so too was it available to plaintiff in this case. Defendant's argument misses the decisive difference between the facts in *Murray* and those in this case. In *Murray*, we faulted the plaintiffs' failure to read the deed under the circumstances of that case; those circumstances included the fact that the plaintiffs knew of the defendants' intention to insert the revision in the deed, understood the legal significance of that revision, were never assured the revision would not be included, and nevertheless failed to read the deed to make sure the revision had not been added. 179 Or App at 305-07. Here, in contrast, defendant's statements and actions never reasonably alerted plaintiff to be concerned about the property descriptions.

Defendant's reliance on *Foster* is similarly unavailing. There, the plaintiff had brought a breach of contract claim arising out of a land sale contract with the defendant,

and the defendant had answered that she was entitled to reformation of the boundary lines in that contract because of mutual mistake. 177 Or App at 50-51. The trial court granted reformation in favor of the defendant. We reversed, emphasizing that the defendant, by her own admission, had been aware of the property descriptions of which she now complained and "notwithstanding that knowledge, gave her attorney a copy of that legal description to incorporate into the land sale contract." *Id.* at 55-56. Consequently, the defendant's conduct constituted gross negligence sufficient to bar reformation. *Id.*

Thus, in *Foster*, we found gross negligence where the party seeking reformation had not only known about the property description at issue, but had also provided her attorney with a copy of that legal description to incorporate into the contract. Here, in contrast, plaintiff did not know that the preliminary title reports included the additional Grant County land and timber in Townships 7 and 8. In sum, *Murray* and *Foster* confirm, rather than contradict, our determination that plaintiff's failure to review the underlying documentation in this case did not rise to the level of gross negligence.

■ Finally, with respect to gross negligence, we summarily reject defendant's assertion that plaintiff's failure to review the property description of the ultimate draft of the Amended Sales Agreement precluded reformation. Beyond our analysis set out above, 187 Or App at 372-74, we note that Eves both manipulated the margins to conceal the changes in the property description and failed to identify those changes, in violation of the parties' well-established practice. Given those circumstances, plaintiff's failure to detect those changes was unexceptionable.

Plaintiff proved all the elements of reformation permitting reference to the Term Sheet's property description as the operative antecedent agreement. Although our analysis materially differs from the trial court's, particularly in our identification of the antecedent agreement, the result is the same: The property description of the Amended Sales Agreement must be reformed in the manner specified in the trial

court's judgment.[27] Accordingly, we affirm the trial court's allowance of reformation.

Defendant's second assignment of error challenges the trial court's award of damages. *See* 187 Or App at 354 n 8. Defendant advances two principal arguments: (1) If, as the trial court concluded, plaintiff was entitled to reformation based on the Sales Agreement, the trial court erred in failing to award defendant damages resulting from plaintiff's "material breach" of the other terms of that agreement. (2) The trial court erred in awarding plaintiff "duplicate" damages.

We have previously, albeit indirectly, considered and rejected defendant's first argument in our discussion of the "antecedent agreement" requirement. *See* 187 Or App at 371. As we noted there, defendant's "all-or-nothing" approach, requiring substitution of the entire prior agreement, would require reformation of terms that were not the product of unilateral mistake. That approach would, in effect, compel rescission in the guise of "reformation." We reject defendant's second argument without discussion.

Affirmed.

---

[27] The judgment provides:

"The Amended Sales Agreement shall be reformed in the manner sought by [plaintiff] in its Fourth Amended Complaint to exclude from that agreement the land which is described in Exhibit 2 to plaintiff's Fourth Amended Complaint, and which is further described in Exhibit 'A,' which is attached to this Final Judgment, and incorporated by this reference."